**Henry DAVID and wife, Grace David, Appellants,**

v.

**Robert L. PHINNEY, District Director of Internal Revenue, Appellee.**

**No. 20941.**

United States Court of Appeals Fifth Circuit.

July 21, 1965.

Rehearing Denied Aug. 26, 1965.

372

Charles J. Sullivan, Joe H. Reynolds, John M. Robinson, Houston, Tex., Bracewell, Reynolds & Patterson, Houston, Tex., of counsel, for appellant.

Jonathan S. Cohen, Atty., Dept. of Justice, John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., Woodrow B. Seals, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., for appellee.

Before RIVES and BROWN, Circuit Judges, and HANNAY, District Judge.

RIVES, Circuit Judge:

The District Director of Internal Revenue made a deficiency assessment against the taxpayers[1] for income taxes for the year 1956 in the sum of $49,566.99 plus interest. The taxpayers paid the amount of said assessment and, their claim for refund having been denied, filed this suit. The complaint alleged that "in February 1956, Mississippi River Fuel Corporation paid Henry David $629,226.75 for the 1,000 shares of Milwhite Mud Sales Com-

---

1. Grace David, the taxpayer's wife, is a party hereto solely by virtue of the fact that she filed a joint return with her husband for the taxable year ending December 31, 1956.

pany stock, which he had owned since 1952. That the sale thereof constituted a long-term capital gain and as such was taxable only as a long-term capital gain." The complaint further alleged that the taxpayers' claim for refund was "based upon refusal of the Commissioner to allow 100% of the amount received from Mississippi River Fuel Corporation for the sale of 1,000 shares of Milwhite Mud Sales Company stock to Mississippi River Fuel Corporation." In a pretrial order signed by the attorneys for both sides, as well as by the district judge, the issues to be tried were agreed upon and stipulated. After a full trial and the consideration of briefs, the district court entered its findings of fact and conclusions of law, followed by judgment for the defendant. The plaintiffs' motions for new trial and for amended findings and conclusions were denied, and this appeal followed:

In entering its findings of fact and conclusions of law, the district court further refined the issue as follows:

"The question presented is whether money received by the plaintiffs from Mississippi Fuel Corporation in 1956 included payment for an option to purchase stock and a covenant not to compete in addition to the actual purchase price of the stock."

Milwhite Company, Inc., hereinafter called Milwhite, was a miner, manufacturer, and supplier of nonmetallic minerals used as drilling mud in the sinking of oil and gas wells. The taxpayer, hereinafter referred to as David, worked as a salesman employee of Milwhite in 1938 and 1939. From 1940 to 1952 David acted on a commission basis as exclusive sales representative of Milwhite's drilling mud.[2] In 1952, at David's suggestion and with Milwhite's financial support, a separate company was organized to handle the sales of Milwhite's drilling mud, known as Milwhite Mud Sales Company and hereinafter referred to as Mud.[3] David had already built a sales organization of some thirty-odd men, and after the incorporation of Mud, that organization was greatly expanded but continued to be based primarily on David's personal contacts and reputation in the industry. David was one of the most outstanding salesmen of drilling mud, and was the dominant personality and key man in Mud's sales organization. By 1955 Mud needed new capital for its expanding business for reasons well explained in David's testimony:

"A. Well, we were greatly undercapitalized and we were expanding and doing more business than our capital justified and any little accounts receivable that was delayed in payment was a great strain on us. We were in jeopardy with the bank we were doing business with in that we had short term money which was an insufficient amount to expand the business and meet with the new amount of sales that were increasing daily. It got to the point to where we either had to do less business or sell the company."

David and a vice-president of Milwhite went to New York and negotiated with W. R. Grace and Company. Mud then had outstanding 6000 shares of stock, of which Milwhite owned 3000, David individually 2000, and David as guardian for his minor children 1000. A contract was entered into giving the Grace Company a ninety-day option to buy Milwhite's 3000 shares for $1,000,000 plus accrued net worth during the fiscal year, and also to buy the 3000 shares owned or controlled by David for the same price. The Grace Company made an exhaustive study and report of Mud, which emphasized David's leadership in the mud sales

---

2. Milwhite also mined and manufactured products for different purposes, such as filter clay, which amounted to about 20 or 25 per cent of its total sales, and for which it had other sales agents.

3. While Mud was Milwhite's exclusive sales agency, Mud also sold some other products which Milwhite could not supply.

business, but Grace Company elected not to purchase.

David was then advised that any prospective purchaser of Mud would probably want 100 per cent of its stock. Accordingly, David secured from Milwhite a ninety-day option to purchase its 3000 shares for one million dollars plus accrued net worth. The option also contained a provision that the purchaser should take Mud's notes held by Milwhite at face value plus accrued interest. (Mud was amply solvent and there is nothing to indicate that its notes were worthless.) Those notes which aggregated some $594,000 had been subordinated to loans of $750,000 made by Texas National Bank to Mud.

Mississippi River Fuel Corporation, hereinafter called Mississippi, was familiar with the negotiations of the Grace Company for the purchase of Mud. After Grace Company declined to purchase, Mississippi contacted David and arranged a meeting in Palm Beach, Florida, in January 1956. There an agreement to sell control of Mud to Mississippi was reached on a "hand shake" basis.

As to David's option to purchase Milwhite's stock, Mr. Bolinger, who represented Mississippi in the negotiations, testified:

"Certainly we weren't interested in 50 per cent of the company and we would never have gone as far in our discussion with Mr. David had we not assumed that he could turn over all of the stock if we wanted all of the stock. I don't recall any mention particularly was made, or any examination was made of any such option agreement. We just assumed he could control all of the stock. He said he could—or represented all of it. We were dealing with one person as if he owned all of the stock."

Mr. Bolinger further testified that he did not recall any money being specifically ascribed to the option. Nor did Mr. Bolinger recall any mention of a covenant by David not to compete, but "at the initial negotiations at which I was present it was just assumed that that was part of the deal." Mr. Bolinger further testified:

"* * * He [David] was the key man in the company, the very dominant factor in this company, and in our opinion he was one of the most if not the most outstanding guy in this business. Certainly he was part of the price. I'm sure we wouldn't consider buying this company without his organization of the service company."

David also testified that there was no conversation about the covenant not to compete, that the entire amount he was to receive was for the purchase of 1000 shares of his Mud stock, and that absolutely nothing was paid for the option or for the covenant not to compete.

Upon David's return to Houston, he gave his attorney, Mr. Robinson, a memorandum of the negotiations, including the following:

"David has arranged to purchase Milwhite, Inc. stock totaling 50% in Milwhite Mud Sales Company to be purchased by Mississippi River Fuel on a price based according to the Grace formula, which was one million dollars as of April 30, 1955, plus the net worth increase of the sales company until the time of this sale. David agrees to sell ⅓ of his stock in the same company to Mississippi River Fuel, but on the basis of $1,500,000. as of April 30, 1955, plus the net worth increase from that date until the time of sale. This will give Mississippi River Fuel 66⅔% of the mud sales and David ⅓ of same.

"As a means of keeping David in his present role of running the mud sales company, Mississippi River Fuel as (sic) offered the following proposition: In addition to this immediate purchase of his ⅓, they would like to have an option to purchase David's entire interest in the mud sales company at anytime with-

in the next five years for the price of $2,500,000. By the same token, David is desirous of having the understanding that for some unforseen (sic) reason, health, death, or otherwise, Mississippi River Fuel is obligating themselves to purchase the remaining David interest in the mud sales according to the formula on which he is selling his ⅓ interest.

"* * *

"David is also procuring from Milwhite, Inc. exclusive sales representation contract and also the irrevocable rights to use all Milwhite Mud Sales' presently named products that has (sic) been used by either the mud sales company or Milwhite, Inc. * * *

"John naturally, I will agree to diligently *prusue* (sic) this job just as I agreed to do for Grace on the basis of my present salary of $50,-000. per year and all the other little things that need to be added to this agreement should be done at this time."

David's attorney prepared a draft of the agreement for submission to Mississippi, which included David's agreement to transfer to Mississippi the option of David to purchase Milwhite's 3000 shares in Mud and obligated Mississippi to exercise that option, but made no reference to any covenant not to compete on the part of David. Mississippi's attorney made a number of changes in the draft so prepared and returned to David's attorney a draft of the agreement which became the executed contract. That contract provides in part:

"M. One of the considerations entering into the purchase price being paid and to be paid for all of said capital stock, is the good will attached to the operations of MUD SALES under the management of DAVID. Accordingly, as an essential part of this Agreement DAVID agrees not to engage in any business or activity in any way competitive with MUD SALES for a period of two (2) years from the date of purchase by MISSISSIPPI of said remaining 2,000 shares and in no event prior to February 1, 1961."

David's attorney testified that he advised David that in his opinion this covenant not to compete was not enforceable in the State of Texas. He further testified that, in his opinion, the maximum value of this covenant not to compete would be $2,500, the cost of legal expenses to defend against it. David testified that, when he observed this provision in the contract:

"Oh, Robinson, and I talked it over and I told him that since I was involved in this new deal, involved as much as I was, that I had enough interest remaining in it that I certainly would have to remain in the company to protect these particular interests and that I didn't particularly object to this because I had hopes of being with this and trying to make this one-third interest that remained in the company worth a lot of money for many years to come."

Mississippi's representatives came to Houston and first closed the contract with David. In a separate meeting at which David was not present, Mississippi closed with Milwhite for the purchase of its 3000 shares substantially at the price and on the terms stated in the option from Milwhite to David. Upon the assumption that the payments to David and to Milwhite were solely for the purchase of their shares of stock in Mud, David received about $166,000 more for the 1000 shares of stock which he sold than Milwhite received for each of the three 1000 shares which it sold. The Director did not allocate all of this difference to something other than the shares of stock, but averaged the prices paid for all 4000 shares, and allocated the portion in excess of the average selling price, or approximately $125,000.

The district court held that the written contract between David and Mississippi truly expressed the intention of the parties and showed that David

intended to transfer to Mississippi not only his 1000 shares of stock in Mud, but also his option to purchase Milwhite's shares, which option he had held for less than six months, and David's own covenant not to compete. The district court further held that the total consideration for the contract must be allocated to its component parts, that a part of the consideration was paid to David for the assignment of his option to purchase Milwhite's stock, and a part for David's covenant not to compete. The court further held that David had failed to offer any credible evidence that the tax was erroneously assessed or the correct amount of the tax due as a refund.

After a careful reading and study of the record, we do not find any material errors in the findings of fact made by the district court.

■ The district court declined to admit in evidence the Internal Revenue Service Agent's explanatory report delivered to the taxpayers as an explanation of the deficiency assessment, but nonetheless permitted the plaintiffs to show:

"Q. What contention did he make, Mr. Robinson?

"A. The contention made by the agent was that $125,000 should be allocated, based upon the sale of the option, and it should be a short term capital gain because based upon his statement the instrument of December 2nd had not been in existence for more than six months."

With that explanation in the record, there would appear to be no prejudice from the exclusion of the Agent's report.

No explanation was offered to the district court of the claimed materiality of the report except that the agent did not make the point that a portion of the consideration should be allocated to the covenant not to compete. It is now urged that, since the theory that the taxpayers derived ordinary income from a covenant not to compete was not relied on in the deficiency notice, the defendant had the burden of proving the facts to support that theory.[4]

■ Assuming, without deciding that this is so, the facts were fully developed and showed a contract containing the covenant not to compete. Additional evidence, much from David himself, showed the high value which the purchasing parties put on his continued services and, conversely, his not being in a competitive position. The trial court, as a trier of facts, was entitled to find that this was a material element of the agreement and that a significant portion of the consideration received was attributable to it.

■ It should be noted also that the district court did not hold that *all* of the $125,000 allocated to something other than the shares of stock should be allocated to David's covenant not to compete, but only that a part should be so allocated and a part to the assignment of the option. Under that holding, the rule stated in 10 Mertens Law of Federal Income Taxation § 58A.35, pp. 98, 99, has application.

"Since the action for refund of taxes is in the nature of a common law action for money had and received and is governed by equitable principles, the burden of proof is upon the taxpayer to prove not only that the determination of the tax was wrong, but to produce evidence from which another and proper determination could be made."

---

4. In support of that contention, the appellants cite: Massingale v. United States (D.Ariz., 1959), 3 Am.Fed.Tax R.2d 995; Service Life Insurance Co. v. United States (D.Neb., 1960), 189 F. Supp. 282, aff'd (8 Cir. 1961) 293 F. 2d 72; Hull v. Commissioner (4 Cir., 1937), 87 F.2d 260; Estate of William Beale Hibbs (1951), 16 T.C. 535; Shel-don Tauber (1955), 24 T.C. 179, (A) 1955-2CB9. This view has been rejected by the District Court of Delaware. See 10 Mertens Law of Federal Income Taxation, Zimet Rev., Sec. 58A.35, p. 98, n. 16.03, and also by the Ninth Circuit, Roybark v. United States, 9 Cir. 1955, 218 F.2d 164, 165, 166.

This Court has recognized that burden of proof to be a "settled principle of law"[5] or an "accepted principle."[6]

 The Supreme Court, while holding the burden to be different in a proceeding before the then Board of Texas Appeals, has stated by way of dictum that in an action to recover taxes paid

"Obviously the burden was on the plaintiff, in order to establish a basis for judgment in his favor, specifically to show not merely that the assessment was erroneous, but also the amount to which he was entitled."

Helvering v. Taylor, 1935, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623.

Finding no reversible error, the judgment is

Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting):

I respectfully dissent.

This case shows that what is euphemistically called a "presumption" becomes an absolute to sustain the Commissioner's implied finding in the deficiency determination. In practical effect it puts the imprimatur of law on the unassailable character of a figure plucked out of the air by the Commissioner. I do not think that the presumption is intended to infuse that infallibility into the undisclosed[7] conclusions of this ephemeral agent.

The Taxpayer loses because he did not prove *how* much was attributable to the covenant not to compete. How could he when the parties did not? I assume it had some value. I would think it proper to find out what a *fair* value would be. Hence, my dissent is not an either or situation of total victory for Government or Taxpayer. There is still a place for a determination of that value. And the omnipresent, brooding presumption does not supply a substitute. Nor can it be sugar coated by the references to the equitable nature of a tax refund suit. Here in the name of equity the law puts its blessing on a fiat.

The Commissioner supposedly did two things. First, he concluded that because there was a difference between the sales price for the shares owned by Milwhite and those owned by David, the difference was attributable to the unique provisions of the David agreement. Second, based on the first, he concluded that all of this difference was attributable to the covenant not to compete. I grant that this was certainly permissible as an administrative matter, and it put the burden on the Taxpayer to challenge it.

But the uncontradicted facts of this record are revealing. The cash price was different. But so, too, was the other consideration. Thus, while Milwhite was willing to take $333,000 per 1,000 shares, it would do so only if the buyer would pay off the promissory notes for half a million dollars owed by Mud and which Milwhite had subordinated to a three-fourths of a million dollar debt owed by Mud to a Houston Bank. It is easy for this Court to say that Mud was "amply solvent." But solvency was not the concern of the parties. It could be solvent so far as the law's sterile test of paying off creditors if it liquidated. But that is not what bothered these businessmen. The company was woefully undercapitalized. It was hurting for working capital. As the Court points out, delay in payment of accounts receivable jeopardized its ability to continue in business. It was treading a narrow path with its banks. It was the considered judgment

5. United States v. Harris, 5 Cir. 1954, 216 F.2d 690, 691.

6. Carter v. Campbell, 5 Cir. 1959, 264 F.2d 930, 937.

7. Actually, the Government changed its tune in the trial Court. Up to that time the Commissioner's presumptively correct conclusion was that the difference in sales price was attributable to a short term capital gain from David's sale of his option from Milwhite. Presumably when it got to the Department of Justice, that office thought that there was a better reason which the Commissioner must have unconsciously had in mind all the while.

of these successful businessmen that more capital was needed. The way out was to sell all ownership stock to an outsider. Once that was to be done, Milwhite was unwilling to depend on the ability of the successor management to (a) pay off the bank debt first and then (b) pay off the notes owed by Mud to it.

The solution was to require the purchaser to pay off Mud's notes. Consequently, unlike the supposed determination of the Commissioner that Milwhite got $333,000 per 1,000 shares compared with David's $500,000, Milwhite got $333,000 *plus*. Surely, we cannot conclude that the agreement by Mississippi Fuel to pay this half million to Milwhite was worthless.

But this is not all. Taking the difference the Commissioner attributes it all[8] to the covenant.[9] On what basis is this done? How two sellers, each with different interests to serve, arrive at a price is a precarious basis for determining intrinsic attribution. Maybe one just wants more money. Maybe one thinks that the buyer will pay more. Maybe, as was true here, one (Milwhite) was bound under an option, the other (David) was a "free" agent vis-a-vis the new prospect. But how does the willingness to submit to a demand for more by one enable the Commissioner to say that *all* of the difference is due to the presence of these two peculiar provisions of the David contract while ignoring the substantial unique provisions of the Milwhite contract?

I do not think the presumption can slide over all of these difficult economic and legal questions.[10] And with the facts all in, no factual basis is revealed to sustain the allocation for this amount. When that occurs, we have long held that the presumption no longer carries the

day. Phillips' Estate v. Commissioner, 5 Cir., 1957, 246 F.2d 209.

## ON PETITION FOR REHEARING

### PER CURIAM.

The petition for rehearing filed by the appellants in this cause is hereby denied.

JOHN R. BROWN, Circuit Judge, dissents.

---

8. An adjustment was made from 166,000 down to $125,000, but this was from averaging the sales price of Milwhite and David sales. The difference of some 41,000 was not attributed to any feature of the David contract.

9. Or perhaps in part the short term gain.

