**FULTON CONTAINER CO., Inc.,**
**Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 19913.**

United States Court of Appeals
Ninth Circuit.

Jan. 10, 1966.

Wilson B. Copes, Wellman P. Thayer and Ronald L. Trevithick, Los Angeles, Cal., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Robert Bernstein, Lee A. Jackson, Melva M. Graney, Robert Waxman, Attys., Dept. of Justice, Washington, D. C., Manuel L. Real, U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Div., Los Angeles, Cal., for appellee.

Before CHAMBERS and ELY, Circuit Judges, and TAVARES, District Judge.

ELY, Circuit Judge:

This appeal is from a District Court decision in favor of the Government in an action for tax refund instituted by taxpayer under 28 U.S.C. § 1346(a) (1) (1964). Taxpayer properly invokes our jurisdiction under 28 U.S.C. § 1291 (1964).

The taxpayer, a company engaged in the manufacture and sale of both multiwall and textile bags, sold its multiwall bag business to West Virginia Pulp and Paper Company. Negotiations, initiated by the purchaser in early May of 1958, led to the execution, on June 18, 1958, of an "Asset Purchase Agreement". Under the instrument's terms, the taxpayer agreed not to reenter the multiwall bag business or compete with the purchaser in such business for a five-year period. At the same time, in a lease agreement with Friedman Bag Company, the parent of taxpayer, the purchaser agreed not to manufacture textile bags on the leased premises during the same period. Taxpayer had desired that mutual covenants not to compete be included within the terms of the "Asset Purchase Agreement", but the purchaser insisted that the final sale agreement not define such a broad obligation as to it.

The sale agreement called for the payment to taxpayer of $918,704.50. Of this total amount, $503,396.30 was allocated "for the personal property and agreements not to compete". In the agreement itself, no specific sum was allocated to taxpayer's covenant not to compete. In its books of account and in its tax return, the taxpayer allocated $505,499.41 to its sale of fixed assets and reported a long-term capital gain of $363,498.52. It allocated nothing to the covenant. The Commissioner of Internal Revenue, through the District Director, determined that $250,000.00 of the reported gain was attributable to taxpayer's covenant not to compete and, therefore, constituted ordinary income. For a more detailed summary of the circumstances relevant to the transaction, the District Court's Findings of Fact and Conclusions of Law, not reported elsewhere, are reproduced below.[1]

I.      "FINDINGS OF FACT

I.

By an agreement entitled 'Sales Agreement' and dated June 1, 1957, the Fulton Container Company, a California corporation, purchased all of the assets of the Los Angeles plant of the Fulton Bag and Cotton Mills, a Georgia corporation, for an aggregate consideration of $803,153.45. Of the aggregate sales price, $56,504.86 was designated in the agreement as the cost of the machinery and equipment used to manufacture textile bags and $107,634.95 was designated in the agreement as the cost of machinery and equipment used to manufacture multi-wall paper bags. Subsequently, some additional machinery and equipment of an unspecified value was purchased.

II.

The Fulton Container Company is a wholly owned subsidiary of the Friedman Bag Company. Samuel Friedman, Solman Friedman, and Morris Friedman are the stockholders of the Friedman Bag Company.

III.

At the time of formation of the Fulton Container Company, it was contemplated that it would engage in the business of manufacturing multi-wall and textile bags and that such business would be carried on continuously in the future.

Note 1—Continued

### IV.

From June, 1957 to June, 1958, the Fulton Container Company, the taxpayer, manufactured and sold both textile and multi-wall paper bags.

### V.

In early May, 1958, Jason Elsas, an employee of West Virginia Pulp and Paper Company, telephoned Samuel Friedman, President of the Friedman Bag Company, stating that West Virginia was interested in getting into the multi-wall paper bag business on the West Coast and asking if the Los Angeles multi-wall operation of Fulton could be purchased. After some discussion with Jerome B. Wesler, President of the Fulton Container Company, and Morris Friedman and Solman Friedman, brothers of Samuel Friedman, Samuel Friedman telephoned Mr. Elsas and stated, generally, that a sale might be possible under certain terms and upon certain conditions.

### VI.

Subsequently, on May 23, 1958, Jason Elsas, E. Noble Lowe, and Lawrence J. Kavanaugh, the Secretary-General Counsel, and the Treasurer, respectively, of West Virginia, met with Samuel Friedman, Morris Friedman, and Jerome B. Wesler at the Beverly Hilton Hotel in Beverly Hills, California. An option to purchase the multi-wall bag facilities of Fulton was discussed. Samuel Friedman stated the price he would insist upon. Mr. Lowe testified that he pointed out that a covenant not to compete was essential to West Virginia. Mr. Wesler and Mr. Friedman testified that a covenant not to compete was not discussed. No agreement was reached.

### VII.

A conflict of testimony exists with respect to the terms and conditions discussed at the meeting on May 23, 1958 at the Beverly Hilton Hotel. Mr. Wesler testified that Fulton offered to sell its multi-wall bag business for a sum equal to:

(1) Cost to Fulton of all its machinery and equipment, both multi-wall and textile (with Fulton retaining its textile machinery and equipment); plus

(2) Cost to Fulton of its multi-wall inventory; plus

(3) Value of multi-wall accounts receivable; plus

(4) $300,000.

The figure of $300,000 was reduced to $250,000 before the meeting concluded.

Mr. Lowe's recollection of the proposal advanced at this meeting is quite different. After the meeting concluded, Mr. Lowe embodied the proposal as he understood it in a draft of an option agreement. According to Mr. Lowe, therefore, Fulton offered to grant an option to West Virginia for a period of ten days 'to purchase from Fulton Container Corporation such of its machinery, equipment, furniture, fixtures, accounts receivable and inventory used or useful in the multi-wall bag business as you choose to purchase for Two Hundred and Fifty Thousand Dollars ($250,000) plus the cost to Fulton of the items which you choose to purchase, provided you purchase items of a total cost to Fulton of not less than Two Hundred Thousand Dollars ($200,000), and provided all inventories of paper and all machinery used exclusively to manufacture multi-wall bags is purchased.' Regardless of the conflicting versions of the initial proposal, it is clear, as stated earlier, that no agreement was reached at this meeting.

### VIII.

On the evening of May 23, 1958, Elsas, Lowe, and Kavanaugh met with Samuel Friedman, Wesler, and William C. Stein, Esq., Fulton's attorney, at 801 Commercial Street, Los Angeles, California. Lowe brought to that meeting the draft of an option agreement that he had prepared following the meeting at the Beverly Hilton Hotel. The option embodied Fulton's proposal as understood by Mr. Lowe. With respect to covenants not to compete, the option contained this provision:

'Fulton Container Corporation and its stockholders will agree not to compete in the multi-wall bag business in the western portion of the United States for a period of ten (10) years, provided you agree not to enter the textile bag business west of the Rocky Mountains.'

After lengthy discussion of the draft prepared by Lowe, the final option agreement was drafted. It is clear that a considerable portion of the discussions concerned whether a covenant not to compete should or should not be included in the final agreement.

### IX.

With respect to the multi-wall machinery and equipment, the final agreement granted an option to West Virginia for a period of seven days, as follows:

'To purchase from Fulton:

(a) All of its multi-wall machinery, parts and equipment and all of its furniture, fixtures, clerical supplies, etc., and to pay for same at Fulton's costs of all its multi-wall and textile machinery, parts and equipment, as the same appears on the books and records

Note 1—Continued

of the Company, on invoices, purchase orders, and requisitions as of this date; it beig (sic) provided, however, that the textile machinery and equipment which was purchased by Fulton subsequent to June 1, 1957 shall not exceed the sum of $25,000.

(b) Its entire multi-wall inventory, twine, tapes, inks, rubber for plates, and the like, at present replacement prices.

(c) All of its multi-wall accounts receivable at face value.

(d) All of its trucks, motor vehicles and accessories at our costs, and to pay for same on the basis indicated plus the sum of $250,000 in cash.'

X.

With respect to covenants not to compete, the final agreement contained this provision:

'If said option is exercised, the agreement, hereinabove referred to will contain mutual agreements restricting competition as between you, Fulton Container Company, Inc. and Friedman Bag Co. of Los Angeles as are legal.'

XI.

The option contained in the final agreement was exercised on behalf of West Virginia by a telegram dated May 29, 1958.

XII.

Several meetings were held in early June, 1958 in the law offices of Gibson, Dunn and Crutcher in Los Angeles, California. Those present at one or more of the various meetings included Lowe, Elsas, Kavanaugh, Wesler, Samuel Friedman, Stein, and Hubert Sturdy, an attorney representing West Virginia. At these meetings, representatives of West Virginia insisted on the covenant as an essential part of the agreement, and in spite of the final option agreement's, requiring mutual covenants not to compete, further insisted that the final sale agreement not contain an obligation not to compete on their behalf. A preliminary draft of the sale agreement contained mutual covenants restricting competition between Fulton and West Virginia.

XIII.

On June 18, 1958, a document entitled 'Asset Purchase Agreement' was executed. Paragraph 1(a) of the Asset Purchase Agreement described the assets to be sold as follows, in pertinent part:

'(a) *Machinery, Equipment and Other Assets.* All machinery, equipment, (including, without limitation, plates, mats, cylinders, and office equipment),

trucks, motor vehicles, furniture, fixtures, tools, spare parts, accessories and other personal property which is used or useful in connection with the multi-wall bag business conducted by Seller, and the agreements not to compete for five years, all as set forth in the attached Schedule A.'

With respect to the purchase price, Paragraph 2(a) of the Asset Purchase Agreement provided in pertinent part:

'2. *PURCHASE PRICE.* The purchase price of assets referred to in Section 1 hereof shall be $918,704.50 (subject to adjustment as provided in Section 14) allocated as follows:

(a) $503,396.30 for the personal property and agreements not to compete referred to in Section 1(a) hereof and set forth in Schedule A.'

With respect to covenants not to compete, Paragraph 17 of the Asset Purchase Agreement provided:

'17. *COVENANT NOT TO COMPETE.* In order to protect and preserve the multiwall bag business to be sold to the Buyer hereunder, Seller will not, for a period of five (5) years after the Closing Date, directly or indirectly enter into or compete with the Buyer in the multiwall bag business or any business involving the manufacture, production, processing or selling of bags made primarily from paper (except open mesh paper bags) or employ any new salesman to, or permit any present or future salesman to, sell or solicit orders for bags made primarily from paper (except open mesh paper bags). It is understood, however, that nothing contained herein shall prevent Seller from continuing to engage in the textile bag business now conducted by it and to continue such textile bag business under its present corporate titles and trade names.'

Schedule A of the Asset Purchase Agreement stated that Fulton's covenant not to compete was included in Paragraph 17 and set forth an additional covenant not to compete between West Virginia and the Friedman Brothers Investment Company, a partnership, and Friedman Bag Company, Inc., a corporation.

XIV.

At the time of execution of the Asset Purchase Agreement, a lease was executed by West Virginia, as lessee, and Friedman Brothers Investment Company, a partnership, as lessor, with respect to a new building which had been built by Friedman Brothers Investment Company for housing the Fulton Container

Note 1—Continued

Company. Section 22 of the lease provided that West Virginia would not manufacture burlap bags, woven cotton bags, bags the entire exterior surface of which is made of burlap or woven cotton, or open mesh bags made of cotton or paper, upon the leased premises for a period of five years. No portion of the lease payments was allocated by the parties to the restriction upon use of the premises contained in Section 22.

### XV.

After the sale of its multiwall machinery and equipment, Fulton continued to manufacture and sell textile bags until 1961. In 1961, Fulton ceased its manufacturing operations and thereafter and, thereafter sold textile bags manufactured by the Friedman Bag Company.

### XVI.

The aggregate consideration received by Fulton was allocated on its books as follows:

| | |
|---|---|
| Fixed assets in business | $505,499.41 |
| Inventories | 313,775.18 |
| Accounts Receivable | 146,370.34 |
| Reimbursement or moving and installation costs | 26,487.96 |
| Total | $992,132.89 |

No portion of the aggregate consideration received was designated as payment for the transfer of 'good will.'

### XVII.

Although not mentioned in the Asset Purchase Agreement and although no portion of the aggregate consideration received was designated on the books of Fulton as payment received for the transfer of 'good will,' some 'good will' was transferred. Paragraph 4 of the Asset Purchase Agreement required Fulton to deliver 'a list of all of seller's multiwall bag customers and their credit status and a list of all prospective customers.' Paragraph 15(d) of the Asset Purchase Agreement required Fulton to 'use its best efforts * * * to preserve intact (its) organization with respect to such business, its customers, suppliers, salesmen and others having relations with it in connection with such business.'

### XVIII.

Of the $505,499.41 paid under Section 2(a) of the Asset Purchase Agreement, West Virginia allocated $346,715.00 to the purchase price of the machinery and $158,784.41 to the covenant not to compete. The allocation was made without the knowledge or consent of Fulton. No portion of the aggregate consideration paid was designated by West Virginia as payment for the acquisition of 'good will.'

### XIX.

The covenant not to compete contained in the Asset Purchase Agreement was not a device or scheme for transferring the 'good will' of Fulton. Fulton had existed in the multiwall bag business for only one year and had earned an estimated profit of only $9,000. Under these circumstances, only a minimal value can be attributed to 'good will.'

### XX.

From the time it commenced business in 1957 to March 31, 1958, Fulton made gross sales of textile bags in the amount of $1,231,294.89 and gross sales of multiwall bags in the amount of $1,514,071.70. During this period of time, Fulton earned $18,055.22, approximately one-half of which was attributable to its multiwall bag business.

### XXI.

Fulton employed no secret processes in its manufacture of multiwall bags and in May or June, 1958, there were other companies manufacturing and selling multiwall bags on the Pacific Coast.

### XXII.

The Asset Purchase Agreement was executed only after extended negotiations and discussions commencing May 23, 1958 and concluding June 18, 1958. The inclusion of a covenant not to compete in the Asset Purchase Agreement was discussed at length throughout the negotiations. West Virginia and Fulton were each represented by Counsel during the entire period.

### XXIII.

Jerome Wesler, Samuel Friedman, and their attorney knew that the Asset Purchase Agreement contained a covenant not to compete by Fulton at the time of execution of the Asset Purchase Agreement.

### XXIV.

At the time of execution of the Asset Purchase Agreement, West Virginia and Fulton intended to allocate a portion of the purchase price to the covenant not to compete.

### XXV.

On its Federal income tax return for the fiscal year ending March 31, 1959, Fulton reported the gain on the transaction in the aggregate amount of $363,498.52 as long-term capital gain. The District Director determined that $250,000.00 of the gain reported was attributable to the covenant not to compete and therefore, constituted ordinary income.

### XXVI.

Throughout these proceedings, Fulton has contended and argued that no part of the purchase price received by Fulton

Appellant makes two contentions. First, it says that the trial court erred in its finding that it and the purchaser, at the time of the execution of the "Asset Purchase Agreement", intended to allocate *a* portion of the purchase price to the covenant not to compete. Inasmuch as the agreement itself does contain a covenant by taxpayer not to compete, we cannot hold that a finding that the parties intended to allocate *some* portion of the purchase price to the covenant was clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Yandell v. United States, 315 F.2d 141 (9th Cir. 1963); Fed.R.Civ.P. 52(a).

Our principal attention must be focused on taxpayer's second contention, that, assuming the existence of intent to allocate some portion of the purchase price to taxpayer's covenant, the District Court erred in upholding the District Director's determination that $250,000.00 was a proper sum for such allocation.

Neither party distinguished itself in presenting adequate evidence to enable the trial court to decide, and us to review, the issue which is before us. The Commissioner saw $250,000.00 as the difference between $503,396.30, that part of the purchase price assigned "for the personal property and agreements not to compete" and $253,396.30, the value of the personal property as shown by taxpayer's books, and determined that such amount must necessarily be the value of the covenant not to compete. There is no other evidence tending to support a $250,-000.00 evaluation of the covenant. However, the Commissioner's determination carries with it a presumption of its correctness, and it is the taxpayer's burden to demonstrate the determination's incorrectness. Lewis v. Reynolds, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932); Roybark v. United States, 218 F.2d 164 (9th Cir. 1954); see 10 Mertens, Federal Income Taxation § 58A.01 (Supp. 1965); see also United States v. Rindskopf, 105 U.S. 418, 422, 26 L.Ed. 1131 (1881). To us, it seems apparent that the District Court, confronted with unsatisfactory evidence, believed, quite understandably, that its only choice was to apply the presumption and uphold the Commissioner. The difficulty of a taxpayer's position, when faced with the presumption in certain situations, has recently been emphasized by Judge Brown of the Fifth Circuit. He wrote,

"This case shows that what is euphemistically called a 'presumption' becomes an absolute to sustain the Commissioner's implied finding in the deficiency determination. In practical effect it puts the imprimatur of law on the unassailable character of a figure plucked out of the air by the Commissioner. I do not think that the presumption is intended to infuse that infallibility into the undisclosed conclusions of this ephemeral agent.

Note 1—Continued

was allocated to the covenant not to compete. No contention or argument has been made that some amount other than $250,000.00 was allocated to the covenant not to compete.

XXVII.

On July 27, 1960, Fulton paid the income tax deficiency assessed for its fiscal year ending March 31, 1959, in the amount of $64,383.39 and, on August 23, 1960, paid the interest thereon in the amount of $4,311.92. A claim for refund of the entire amount paid was filed with the District Director on December 22, 1960. The claim for refund was rejected on August 11, 1961. Thereafter, and within the time prescribed by law, this action was commenced.

CONCLUSIONS OF LAW

I.

This Court has jurisdiction of the parties and the subject matter.

II.

Plaintiff has failed to prove that it overpaid its Federal income tax by any amount for the fiscal year ending March 31, 1959.

III.

The District Director of Internal Revenue properly determined that $250,-000.00 of the aggregate purchase price received by plaintiff was allocated to the covenant not to compete."

"The Taxpayer loses because he did not prove *how* much was attributable to the covenant not to compete. How could he when the parties did not? I assume it had some value. I would think it proper to find out what a *fair* value would be. Hence, my dissent is not an either or situation of total victory for Government or Taxpayer. There is still a place for a determination of that value. And the omnipresent, brooding presumption does not supply a substitute. Nor can it be sugar coated by the references to the equitable nature of a tax refund suit. Here in the name of equity the law puts its blessing on a fiat."

David v. Phinney, 350 F.2d 371, 377 (5th Cir. 1965) (dissenting opinion). (Emphasis in original.)

Judge Brown's language closely fits our reaction to the result of the challenged determination in the case at bar.

The key to the determination of the value of a covenant not to compete is the intent of the parties at the time of the execution of their agreement. Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9th Cir. 1962). Here, while the taxpayer may have failed to prove that which the parties intended as the value of the covenant or its exact, actual worth, it did offer sufficient evidence to prove that it was not intended that it was valued at $250,000.00. Furthermore, there is uncontradicted evidence that it was not in fact worth $250,000.00.

The first indication of intent at the time of the agreement is found in the agreement itself, where the parties assigned no specific value to the covenant. In Annabelle Candy Co., supra, Judge Barnes, for our court, wrote that the failure to assign a value to the covenant in the contract is "pretty good evidence that no such allocation was intended [although] it is not conclusive on the parties as would be the case if there had been an express affirmance or disavowal in the agreement." 314 F.2d at 7; see also Rinehart Oil News Co., P-H Tax Ct.Mem. ¶ 65,178, 6–29–65. It is true that the covenant was discussed at length by the parties during their negotiations, but it is also quite apparent from the entire record that allocation of a particular value to the covenant was not discussed, nor were the tax consequences.

Since the agreement did not fix a particular value which the parties intended be assigned to the covenant, we look at other evidence for indication of intent. The entries in the books of account of the parties are of some relevance. The taxpayer allocated no part of the purchase price to the covenant. It has consistently maintained that the assets transferred by the agreement were acquired by it at substantially below their true value and that the price paid by the purchaser was in recognition of this higher value and should be accorded capital gain treatment.[2] This contention is partially supported by the fact that the purchaser, in its books, allocated $158,784.41 as the value of taxpayer's covenant, an amount $91,215.59 less than the value fixed by the Commissioner. This allocation by the purchaser, to be amortized over a five-year period, is relevant, although it is, of course, not controlling. If the purchaser of a business is already a profitable going concern, it would ordinarily prefer to allocate as high a value as possible to the covenant because the amortization expense allowed as a deduction would offset its ordinary income. See Note, Tax Treatment of Covenants Not to Compete: A Problem of Purchase Price Allocation, 67 Yale L.J. 1261 (1958); see also Jensen, Purchases of Intangible Business Assets, Tulane 14th Tax Inst. 195 (1965); Freling, Sales of Intangible Business Assets, 14th Tulane Tax Inst. 209 (1965).

2. In addition to payment for inventories, accounts receivable, and certain miscellaneous items, the puchaser agreed to pay to the taxpayer the latter's cost of both its multiwall and textile bag machinery plus $250,000.00 although it was agreed that taxpayer should retain the textile bag machinery. The Commissioner did not disallow as capital gain that portion of the total proceeds which was attributable to the cost to taxpayer of the retained textile bag machinery.

■ The District Court expressly found that the goodwill of the taxpayer's multiwall bag business was of "minimal value". Finding of Fact No. XIX. "Minimal value" means some value; therefore, the maximum value of the covenant, whatever the intent of the parties, must necessarily be something less than the full $250,000.00 allocated by the Commissioner. Since the $250,000.00 represents the only source of consideration for both the goodwill and the covenant, a finding that the goodwill had some value is manifestly inconsistent with determination that the entire sum represents the value of the covenant alone.[3]

The District Court determined in its Finding of Fact No. XXI, that "Fulton employed no secret processes in its manufacture of multiwall bags and in May or June, 1958, there were other companies manufacturing and selling multiwall bags on the Pacific Coast." This indicates that a $250,000.00 evaluation of the covenant, even if made by the parties, bore no "arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner of Internal Revenue, 294 F.2d 52, 55 (9th Cir. 1961). It would seem that whatever value is placed on the covenant by the taxpayer or by the Commissioner, the relationship between the terms of the agreement and "business reality" is a factor which should command the court's careful consideration.

■ From the District Court's findings and conclusions, we are unable to see that the test formulated in Annabelle Candy Co., supra, regarding the intent of the parties, was applied. The course of the trial court's reasoning seems to have been that since the covenant was in fact a part of the agreement, the taxpayer, contrary to its protests, intended

that the covenant have some value and that the value must necessarily be $250,-000.00, the amount chosen by the Commissioner and fixed by calculating the excess of the money received for "personal property and agreements not to compete" over the book value of the "personal property". This simply is not enough. In the light of the whole body of evidence, unsatisfactory as it is, the Commissioner's determination was arbitrary and insupportably oppressive to the taxpayer. "The parties are entitled to a clear cut decision as to what their intent was, as evidenced by the agreement and all the surrounding circumstances." Annabelle Candy Co. v. Commissioner, supra, 314 F.2d at 8.

We remand the cause to the District Court for a redetermination in the light of the views which we have expressed and such additional evidence as the parties may choose to offer.

Reversed.

---

3. It is questionable, although perhaps not impossible, that a proprietorship's agreement not to compete with the purchaser of its business for five years can be said to be worth as much as $250,000.00, while, at the same time, it is said that the goodwill of the business has only a "minimal value". Any attempted explanation for such an extreme disparity in values which are ordinarily more closely related is, under the circumstances of this case, difficult of total acceptance.