**F. & D. RENTALS, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 15403.

United States Court of Appeals
Seventh Circuit.

June 23, 1966.

Rehearing Denied Aug. 1, 1966.

Rehearing Denied Aug. 16, 1966,
en banc.

Edward J. Gray, James F. Thornburg, South Bend, Ind., for petitioner.

Richard M. Roberts, Asst. Atty. Gen., Carolyn R. Just, Atty., U. S. Dept. of Justice, Washington, D. C., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, SWYGERT, Circuit Judge and GRANT, District Judge.

HASTINGS, Chief Judge.

Petitioner, F. & D. Rentals, Inc. (F & D), an Indiana corporation, appeals from an adverse decision of the Tax Court of the United States [1] which upheld the determination by the Commissioner of Internal Revenue of a $98,540.50 deficiency in F & D's income tax for the fiscal year ended April 30, 1958.

F & D was first organized in 1957 under the name of The South Bend Toy Manufacturing, Inc., for the purpose of engaging in the manufacture and sale of toys.[2] This was the same name as that of an Indiana corporation organized in 1882 for the purpose of engaging in the manufacture and sale of toys. (Hereafter referred to as South Bend No. 1 to distinguish it from petitioner's corporation, which will be referred to as South Bend No. 2.)

South Bend No. 1 was owned principally by a South Bend bank as trustee under two separate trusts. The bank, as trustee, sought to sell South Bend No. 1, but received no firm offer prior to March 15, 1957.

On that day, Benjamin F. Fohrman and John W. Dorgan, two Chicago attorneys who had no connection with either

---

1. F. & D. Rentals, Inc. v. Commissioner of Internal Revenue, 44 T.C. 335.

2. In January, 1958, its name was changed to F. & D. Rentals, Inc.

the bank or trusts involved, offered by letter to purchase the business.

The letter stated in part:

"We propose to buy all assets as disclosed on balance sheet dated December 31, 1956 excepting cash, government bonds and negotiable securities for a price of $300,000.00 less than the book value of said assets * * *."

This offer was accepted, and on May 13, 1957, the principal stockholder trustee-bank filed a petition in the St. Joseph Superior Court No. 1 in St. Joseph County, Indiana, seeking approval for the sale. The petition contained, *inter alia,* the following representations:

"5. That The South Bend Toy Manufacturing Company has received a proposal from Messrs. Benjamin F. Fohrman and John W. Dorgan of Chicago, Illinois to purchase all assets of The South Bend Toy Manufacturing Company as the same shall exist on May 31, 1957, excepting and excluding from such sale cash on hand and in banks, refund claims for taxes, if any there be, federal, state and local, whether or not arising from the contemplated transaction; * * * that said prospective purchasers have offered to pay the "book value" of the assets to be purchased as such book value is determined by the auditors of the company to be as at May 31, 1957 in accord with the normal accounting procedures employed by such company auditors in computing the book value thereof, less the sum of Three Hundred Thousand Dollars ($300,000.00), * * *.

"6. That it is anticipated that such sale will result in a corporate loss of Three Hundred Thousand Dollars ($300,000.00) which, together with the seasonal net operating loss for the current fiscal year of the corporation, is likely to result in a federal net income tax refund to The South Bend Toy Manufacturing Company of approximately One Hundred Ninety-two Thousand One Hundred Dollars ($192,100.-00), dependent upon variables, including the variable of the exact seasonal loss to date of closing; that, therefore, the net realization to be experienced by the corporation on account of the transaction would be approximately One Hundred Forty-four Thousand Dollars ($144,000.00) less than the book value of the net worth of the corporation as at December 31, 1956 in the amount of One Million Five Hundred Fifty-eight Thousand Six Hundred Seventy-six Dollars ($1,558,676.00) and accordingly that the net realization anticipated to the corporation from the transaction is likely to approximate One Million Four Hundred Fourteen Thousand Six Hundred Seventy-six Dollars ($1,414,676.-00), subject to Indiana gross income tax and costs incident to perfecting the transaction; that Messrs. Dorgan and Fohrman, as an incident to the transaction, have undertaken to enter a certain contract with the shareholders of the corporation whereby they will guarantee such anticipated tax refunds * * *."

On the same day, the Superior Court entered an order authorizing the trustee-bank to vote, as majority stockholder, in favor of the sale to Fohrman and Dorgan.

On May 22, 1957, a formal purchase and sale agreement was entered into by South Bend No. 1 and Fohrman and Dorgan. This agreement provided in effect that South Bend No. 1 would sell to Fohrman and Dorgan, or their nominee, all the operating assets of South Bend No. 1 at a purchase price equal to the book value of the assets, reduced by $300,000. The assets thus sold were by agreement to be listed and priced to reflect the $300,000 reduction in book value. In the event the parties failed to agree upon the proper allocation of the $30,000 among the various assets, a neutral third party was to make a decision binding on the parties.

On May 24, 1957, South Bend No. 2 was organized by Fohrman and Dorgan, and

received, as their nominee, all their right, title, and interest under the agreement of purchase and sale.

Fohrman and Dorgan made the allocation of the $300,000 reduction from book value, and the trustee-bank, as majority stockholder, agreed to it.

The book value of South Bend No. 1 and the allocation of reduction were as follows:

| | (1) Value per books of South Bend Toy No. 1 | (2) Allocation of "reduced" purchase price by Fohrman and Dorgan | (3) Reduction if any, from book value |
|---|---|---|---|
| **Current Assets** | | | |
| Petty cash | $ 750.00 | $ 750.00 | —0— |
| Cash in bank | 100.00 | 100.00 | —0— |
| Accounts receivable | 252,060.39 | 252,060.39 | —0— |
| Advances for material | 29,014.83 | 29,014.83 | —0— |
| Prepaid insurance | 15,240.38 | 15,240.38 | —0— |
| Airline deposit | 425.00 | 425.00 | —0— |
| Total Current Assets | $ 297,590.60 | $ 297,590.60 | —0— |
| **Inventory** | | | |
| Raw materials | $ 353,677.93 | $ 353,677.93 | —0— |
| Work in process | 111,687.77 | 111,687.77 | —0— |
| Finished goods | 324,986.69 | 324,986.69 | —0— |
| Total Inventory | $ 790,352.39 | $ 790,352.39 | —0— |
| **Deferred Charges** | | | |
| Factory supplies | $ 5,003.87 | $ 5,003.87 | —0— |
| Fuel | 5,607.00 | 5,607.00 | —0— |
| Miscellaneous deferred charges | 2,438.14 | 2,438.14 | —0— |
| Total Deferred Charges | $ 13,049.01 | $ 13,049.01 | —0— |
| **Fixed Assets** | | | |
| Land | $ 33,645.93 | $ 11,817.18 | $ 21,828.75 |
| Building (net) | 152,770.01 | 56,524.90 | 96,245.11 |
| Railway siding (net) | 10,222.26 | 3,782.24 | 6,440.02 |
| Driveway and parking lot (net) | 2,686.31 | 993.93 | 1,692.38 |
| Machinery & equipment (net) | 258,403.35 | 95,609.24 | 162,794.11 |
| Office furniture & fixtures (net) | 6,940.05 | 2,567.82 | 4,372.23 |
| Office machines (net) | 6,601.31 | 2,442.48 | 4,158.83 |
| Truck-tractor (net) | 880.87 | 325.92 | 554.95 |
| Factory trucks (net) | 1,428.17 | 528.42 | 899.75 |
| Construction in process | 1,609.31 | 595.44 | 1,013.87 |
| Total Fixed Assets | $ 475,187.57 | $ 175,187.57 | $300,000.00 |
| Total Assets | $1,576,179.57 | $1,276,179.57 | |

As is obvious from the schedule, the entire $300,000 reduction was applied to fixed assets.

After operating the business for about eight months, F & D entered into an agreement with Playskool Manufacturing Co., whereby a new toy company, once again named South Bend Toy Manufacturing Company, Inc. (South Bend No. 3), was formed to operate the toy business of South Bend No. 2. South Bend No. 3 was owned by F & D and by Playskool in equal shares. South Bend No. 3 leased No. 2's land, machinery and fixed assets.

On March 2, 1960, South Bend No. 3 purchased all the equipment, machinery, etc. of South Bend No. 2 from F & D for $150,000; and Playskool purchased F & D's stock in South Bend No. 3 for $115,000, leasing the realty and buildings from F & D for a monthly rental of $3,750.

On its tax return for the year ended April 30, 1958, F & D computed its cost of goods sold by utilizing the amounts of South Bend No. 1's book values as the cost of its opening inventories. In computing its depreciation deduction, F & D utilized the amounts Fohrman and Dorgan had allocated to land and depreciable assets, an amount $300,000 less than South Bend No. 1's book values for the assets, as its cost basis for its depreciable assets.

The Commissioner determined that F & D's allocation of the $300,000 reduction, as between inventory and fixed assets, was not in accord with their relative values. The Commissioner, therefore, made his own allocation, reducing the cost basis of F & D's opening inventory and increasing the cost basis of land and fixed assets. The Commissioner's allocation increased F & D's gross income by the amount of reduction of cost basis of opening inventory and increased F & D's depreciation reduction through the increase in the cost basis of land and fixed assets.

The allocation as made by Fohrman and Dorgan and that made by the Commissioner are as follows:

|                                     | Allocation by Fohrman and Dorgan | Allocation by respondent |
|-------------------------------------|-----------------------:|-----------------------:|
| **Current Assets**                  |                        |                        |
| Petty cash                          | $       750.00         | $       750.00         |
| Cash in bank                        | 100.00                 | 100.00                 |
| Accounts receivable                 | 252,060.39             | 252,060.39             |
| Advances for material               | 29,014.83              | 29,014.83              |
| Prepaid insurance                   | 15,240.38              | 15,240.38              |
| Airline deposit                     | 425.00                 | 425.00                 |
| Total Current Assets                | $297,590.60            | $297,590.60            |
| **Inventory**                       |                        |                        |
| Raw materials                       | $353,677.93            | $270,014.48            |
| Work in process                     | 111,687.77             | 85,014.48              |
| Finished goods                      | 324,986.69             | 248,110.24             |
| Total Inventory                     | $790,352.39            | $603,392.46            |
| **Deferred Charges**                |                        |                        |
| Factory supplies                    | $   5,003.87           | $   5,003.87           |
| Fuel                                | 5,607.00               | 5,607.00               |
| Miscellaneous deferred charges      | 2,438.14               | 2,438.14               |
| Total Deferred Charges              | $  13,049.01           | $  13,049.01           |
| **Fixed Assets**                    |                        |                        |
| Land                                | $  11,817.18           | $  25,686.90           |
| Building (net)                      | 56,524.90              | 116,631.86             |
| Railway siding (net)                | 3,782.24               | 7,804.16               |
| Driveway and parking lot (net)      | 993.93                 | 2,050.85               |
| Machinery and equipment (net)       | 95,609.24              | 197,277.36             |
| Office furniture and fixtures (net) | 2,567.82               | 5,298.36               |
| Office machines (net)               | 2,442.28               | 5,039.74               |
| Truck-tractor (net)                 | 325.92                 | 672.50                 |
| Factory trucks (net)                | 528.42                 | 1,090.33               |
| Construction in process             | 595.44                 | 595.44                 |
|                                     | $175,187.57            | $362,147.50            |

In addition to making an independent allocation of the $300,000 reduction, the Commissioner disallowed a claimed pension plan deduction of $24,500. F & D, in acquiring South Bend No. 1, became obligated to assume the burden of two employee pension plans. On its tax return for the year ended April 30, 1958, F & D claimed a deduction of $24,500, representing an accrual on its books for contributions to pension plans. F & D made no payment to the pension plans in the tax year ended April 30, 1958, but merely incurred the obligation in that year.

F & D contested the Commissioner's deficiency determination and disallowance of deduction by filing a petition with the Tax Court. The Tax Court decided both issues in favor of the Commissioner.

On appeal, F & D argues that its allocation of the purchase price for assets was made pursuant to an arms length transaction, was realistic, and, therefore, was not subject to redetermination by the Commissioner; that the reallocation made by the Commissioner was arbitrary, that, at the very least, the purchase

price should be reallocated on the basis that the fair market value each asset bears to the total fair market value of all assets; and, finally, that the pension plan liability F & D assumed should be included as a part of the total purchase price of the assets acquired.

F & D offered evidence which it claimed tended to prove the fair market value of the inventory. The evidence presented related generally to the existing backlog of firm purchase orders, the turn-over of inventory, the fact that inventory was sold in normal trade channels at normal profit margins, and the fact that the finished goods inventory was used as collateral for a loan equal to ninety per cent of its purchase value.

■ The Tax Court stated that such evidence did not constitute proof of the fair market value of inventory. We agree with the Tax Court; such evidence, insofar as it bears upon the fair market value of inventory, is extremely indirect and inseparably entwines inventory value with the fact that South Bend No. 2 was a going concern.

The Tax Court found F & D's allocation artificial and unrealistic because it treated the inventory acquired as the equivalent of cash, notwithstanding the fact that finished goods represented less than half of the total book value, while raw materials and work in process made up the remaining portion. It is apparent to us that unfinished work would require additional labor and expense in finishing, and selling and shipping costs would be experienced on finished goods. This implies that the value of the existing inventory was dependent upon the fact that South Bend No. 2 was an ongoing business. Whatever its independent value, the inventory was not the equivalent of cash.

F & D presented evidence to show that the allocation of the entire $300,000 to land and fixed assets reflected the fair market value of the land and depreciable assets. The Tax Court found that the fair market values were out of line with the amount assigned the various items by Fohrman and Dorgan. The Tax Court

also noted that F & D did not produce any evidence of the fair market value of the inventory.

■ The Commissioner is not required to accept an allocation of a lump-sum purchase price made under a contract of sale. In cases where the contract price allocation did not reflect actual values, the action of the Commissioner in making an independent allocation of his own has been upheld, or the court has looked through the agreement to discover its substance. See Wilson Athletic G. Mfg. Co. v. Commissioner of Int. Rev., 7 Cir., 222 F.2d 355 (1955); Kunz v. C. I. R., 6 Cir., 333 F.2d 556 (1964); Copperhead Coal Company v. C.I.R., 6 Cir., 272 F.2d 45 (1959); Hamlin's Trust v. Commissioner of Internal Revenue, 10 Cir., 209 F.2d 761 (1954); C. D. Johnson Lumber Corporation, 12 T.C. 348.

■ We agree with the Tax Court that F & D did not present the Commissioner with a realistic allocation of the $300,000 reduction. Since we are to uphold findings of the tax court unless clearly erroneous, Wilson Athletic, supra, the finding of the Tax Court that Fohrman and Dorgan's allocation to land and depreciable assets was not in accord with fair market values will not be overturned.

■ It is clear that in this case, there was no evidence of the fair market values of the *inventory* F & D purchased. In the past, the Tax Court has followed the rule that allocation of a lump-sum payment among various assets should be based upon the relative values of each item to the value of the whole. C. D. Johnson Lumber Corp., supra. Since there was no evidence of fair market value for inventory, this rule could not be followed in the instant case, nor could the Commissioner be required to follow it.

■ The Commissioner evidently made his allocation by applying that percentage of the $300,000 reduction to inventory that inventory bore to the total assets, and by giving a similar treatment to fixed assets. In the absence of evidence which would indicate a proper allocation, the Commissioner's allocation is

as reasonable as could be expected. It is presumptively correct, and F & D had the burden of proving that it was plainly arbitrary. Cf. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 50 S.Ct. 263, 74 L.Ed. 848 (1930).

■ As to the Commissioner's disallowance of the pension deduction, § 404 (a) of the 1954 Internal Revenue Code [3] provides that pension plan contributions *paid* into a pension trust are deductible. Although F & D by agreement became obligated to make the pension payment, it was not obligated to any pension plan trustee, and, in fact, made no pension plan payment in the taxable year. We agree with the Tax Court that such an obligation cannot be considered payment under the applicable statute.

■ Under § 404(a) of the Code, taxpayer would have been entitled to a pension plan deduction if it had made a payment in the taxable year here in question or by the time it had filed its return. Since the Code treats pension plan contributions as a deduction, we are not persuaded by the argument that petitioner should be allowed to increase the cost basis of the assets it acquired from South Bend No. 1 by adding its unpaid pension plan obligations. Contingent obligations, insusceptible to present valuation, which are assumed as part of a purchase agreement, are not to be included in the cost basis of assets. See Brown v. Helvering, 291 U.S. 193, 200, 54 S.Ct. 356, 78 L.Ed. 725 (1934); Albany Car Wheel Co. v. C. I. R., 2 Cir., 333 F.2d 653 (1964).

The decision of the Tax Court appealed from is affirmed.

Affirmed.

SWYGERT, Circuit Judge (dissenting in part).

Both the Tax Court and the majority recognize the Tax Court's own rule that when a taxpayer buys a mixed aggregate of assets for a lump sum, the allocation of the purchase price to the separate items should be based upon the relative value of each item to the value of the whole. This rule requires that the fair market value of each item be established and then that the proportion which the fair market value of each item bears to the total fair market value of the aggregate be applied to the lump-sum purchase price, in order to determine the portion of the purchase price to be allocated to each item. The Tax Court and the majority having recognized the rule, conclude that the petitioner failed to introduce any evidence of the fair market value of the inventory purchased and that therefore the rule cannot be applied in this case. The majority adds "nor could the Commissioner be required to follow it." I do not agree with either of these conclusions.

In the Tax Court proceeding, the petitioner submitted the following evidence bearing upon the fair market value of the inventory: (1) the inventory was

3. This section reads in pertinent part as follows:

"§ 404 Deduction for contributions of an employer to an employees' trust or annuity plan and compensation under a deferred-payment plan.

"(a) General Rule.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, * * * such contributions * * * shall not be deductible under section 162 * * * or section 212 * * * but if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

(1) Pension Trusts.—In the taxable year when paid, if the contributions are paid into a pension trust, and such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 501(a). * * *

* * * * *

(6) Taxpayers On Accrual Basis. —For purposes of paragraph (1) * * *, a tax-payer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).

purchased only after a physical audit conducted by independent auditors which priced the inventory items at the lower of cost or market value; (2) at the date of purchase there was a backlog of orders totaling $523,500; (3) inventory turnover was two to four times per year; (4) the inventory was sold in normal trade channels at a normal profit; [1] and (5) the finished goods included in the inventory were used as collateral for a loan equal to ninety per cent of their book value. Certainly the first of these items alone is some evidence of fair market value, and in any event the evidence introduced shows that the value of the inventory was greater than that assigned by the Commissioner.

The Commissioner admittedly produced no evidence relating to the fair market value of the inventory items. His method was merely to spread the $300,000 reduction from book value (the purchase price) proportionally over the items listed in the inventory and fixed assets, relating the book value of each item to the total book value of all the assets. The Tax Court and the majority adopted the Commissioner's reallocation without requiring any justification for it in terms of the "relative fair market values" rule, solely on the strength of the Commissioner's presumption of correctness. I cannot agree that the Commissioner's allocation should be so excused. Since the Commissioner's allocation is admittedly unrelated to the established formula, it cannot be, in the words of the majority opinion, "as reasonable as can be expected." The arbitrary nature of his arithmetic formula is obvious. Its artificiality can hardly be doubted. In these circumstances the presumption ought not to have been used as a substitute for evidentiary proof. The Tax Court should either have made a determination on the basis of the evidence submitted or have required the Commission-

er to support his allocation in accord with the applicable rule. It did neither, but relied upon a discredited presumption.

A similar problem was before the Sixth Circuit in Bryant Heater Co. v. Commissioner of Internal Revenue, 231 F.2d 938 (6th Cir. 1956). There the taxpayer realized a profit of $250,000 in the sale of certain assets, which profit was necessarily attributable to either the inventory or the capital assets, or both. The taxpayer allocated the entire gain to the capital assets. The Commissioner rejected this allocation and asserted a deficiency based upon an allocation made in the same manner as in the instant case. The Commissioner simply related the book value of inventory and capital assets separately to the total book value of these two groups of assets in proportioning the gain attributable to each. The Tax Court accepted the Commissioner's allocation even though no evidence relating his computations to fair market value was offered.

In reversing the decision of the Tax Court, the court stated:

The petitioners offered testimony by representatives of both the buyer and the seller showing that at the time of the sale it was understood by each of them that the inventories were being sold at approximately their book value and that a substantial premium over book value was being paid for the capital assets. The effect of this evidence in our opinion was to overcome the presumption of correctness attaching to the Commissioner's determination by demonstrating the arbitrary nature of the formula upon which it was based, invitingly convenient though that formula undoubtedly was * * * [However,] the petitioners' evidence was not sufficiently exact to establish their contention that no part of the gain was properly attributable to the sale of the

---

1. In eight months of active operation the sales of the petitioner amounted to $2,-070,580. The gross profit realized was $500,560, a gross profit margin of 24.17 per cent. This margin is closely comparable to the profit margin experienced by South Bend Toy No. 1 for the years 1952 through 1956. The effect of the Commissioner's allocation is to exaggerate the gross profit margin on sales made by the petitioner from the normal level to 33.20 per cent.

inventories. It follows that the case should be remanded to the Tax Court for a redetermination of the amount of gain attributable to each group of assets, based upon evidence as to the fair market value of each at the time of the sale. 231 F.2d at 939–940.

In the recent decision of Fulton Container Co. v. United States, 355 F.2d 319 (9th Cir. 1966), the Tax Court's adherence to a similar "book value" allocation by the Commissioner was also rejected. There the taxpayer sold certain assets, realizing a substantial gain attributable to either fixed assets or a covenant not to compete, or both. The taxpayer allocated the entire gain to the fixed assets and reported a long term capital gain. The Commissioner, however, determined that the portion of the sales price which exceeded the book value of the fixed assets was attributable to the covenant not to compete, and made a reallocation on that basis. The Ninth Circuit reversed the Tax Court's acceptance of this reallocation and remanded the case for a redetermination, to be based upon evidence of the value of the fixed assets and the value placed upon the covenant not to compete by the parties to the sale of the assets. In the course of its discussion, the court made the following observation:

> This case shows that what is euphemistically called a "presumption" becomes an absolute to sustain the Commissioner's implied finding in the deficiency determination. In practical effect it puts the imprimatur of law on the unassailable character of a figure plucked out of the air by the Commissioner. 355 F.2d at 324, quoting from David v. Phinney, 350 F.2d 371 (5th Cir. 1965) (dissenting opinion).

I would remand this proceeding to the Tax Court for a redetermination in accordance with the foregoing views.

I concur in that portion of Judge Hastings' opinion relating to the Commissioner's disallowance of the claimed deduction for accrued contributions to the pension plans.