**616**

**READING RADIO, INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 2786.**

United States District Court
D. New Hampshire.

May 22, 1969.

Charles J. Dunn, Wadleigh, Langdell, Starr, Peters & Dunn, Manchester, N. H., for plaintiff.

Louis M. Janelle, U. S. Atty., Concord, N. H., for defendant.

## OPINION

BOWNES, District Judge.

█ This is a "refund suit" for the recovery of income taxes. The focal point of the case is the allocation made of a lump-sum purchase price to the assets of a going business purchased by the plaintiff. More specifically, the plaintiff contests the Commissioner's reallocation of purchase price, reducing the cost basis of the *depreciable assets* from $296,780 to $108,462. Jurisdiction is founded upon 28 U.S.C. § 1346(a)(1). In order to prevail, the plaintiff must meet the formidable burden of proof required to overcome the presumptive correctness of the Commissioner's determination, and must also establish the amount to which he is entitled. Helvering v. Taylor, 293 U.S. 507, 514–515, 55 S.Ct. 287, 79 L.Ed. 623 (1934); Dairy Home Co. v. United States, 180 F.Supp. 92, 95 (D.C.Minn.1960).[1]

## THE FACTS

The plaintiff is a corporation duly organized under the laws of the State of New Hampshire. On April 1, 1961, plaintiff purchased all of the assets of WRAW, Inc., owner and operator of Radio Station WRAW in Reading, Pennsylvania. The purchase price was $307,000. The Purchase and Sale Agreement made no allocation of the purchase price among the various assets.

On its income tax returns for the years 1961, 1962, and 1963 (filed with the District Director at Portsmouth, New Hampshire), the plaintiff allocated $296,780 of the purchase price as the fair market value of depreciable assets

---

[1]. See the brief but comprehensive discussion of the distinction between the taxpayer's burden of proof in a refund suit as opposed to his responsibility before the Tax Court, or on appeal from the Tax Court, in Timken Roller Bearing Co. v. United States, 38 F.R.D. 57 (N.D.Ohio, E.D.1964).

as of the date of sale.[2] The Commissioner redetermined the value of depreciable assets to be $108,462. (Descriptions of the property sought to be depreciated, the cost allocations made by the plaintiff, the cost allocations made by the Internal Revenue Service, and the useful life determinations made by the plaintiff, are shown in a schedule included in paragraph 4 of the "stipulated facts," and attached as "Appendix A" to this opinion.)[3] As a result of the Commissioner's redetermination, a portion of the plaintiff's depreciation deduction for each year was disallowed and deficiencies in tax and interest were assessed and collected in the amounts of $6,047.42 for 1961; $9,747.09 for 1962; and, $8,435.35 for 1963.

■ The plaintiff, subsequent to purchase, separated the "assets" of WRAW, Inc., into twelve groups:[4] eleven of which clearly are composed of all tangible assets (transmitting equipment, fixtures, office equipment, etc.); the twelfth, a transmitter site lease, is the nub of this case. This asset gives Station WRAW the right to use the roof of the Pomeroy Department Store for a transmitter and antenna. The store is located in downtown Reading.

The Commissioner reduced the taxpayer's determination of the fair market value of each of the eleven groups of tangible assets from $196,780 to $108,462. The cost basis of the transmitter site lease was reduced from $100,000 to zero.

## THE ISSUES

■ The plaintiff contests the redeterminations, and stands upon its original estimates of fair market value and allocation of purchase price. The issues, then, are whether or not the plaintiff has sustained its burden of showing that the redetermination of the value of the assets made by the Commissioner is incorrect, and, in addition, proven that its own determinations as to fair market value are accurate and fall fairly within the norms of depreciation deduction allowable under the Internal Revenue Code. In a "refund suit," the taxpayer must show "* * * not merely that the [Commissioner's] assessment was erroneous but also the amount to which he was entitled." Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); Fischer v. Commissioner of Internal Revenue, 288 F.2d 574 (3rd Cir.1961).

## FINDINGS AND RULINGS

A. *Allocation of Purchase Price to Tangible Assets.* The Court rules that the taxpayer has met its burden of proof as to the fair market value of the eleven groups of tangible assets (*i.e.*, all "assets" except the "transmitter site lease"). In making this ruling, the Court takes into consideration the testimony of William F. Rust, Jr., the real party in interest as far as the taxpayer is concerned (and an expert in this field in his own right) and also the testimony of Mr. Jack Harvey, the expert witness called by the plaintiff. The Court also assumes, because no evidence by the government was offered to the contrary, that the transaction between WRAW, Inc., and the taxpayer was an armslength transaction between a willing seller and a ready buyer, each with a

---

2. Included in the purchase price of $307,000 was some realty, assigned a value of $10,220. No question is raised as to the plaintiff's valuation of this land.

3. Although the Internal Revenue Service made a different and lower determination of the fair market value of all groups of the depreciable assets, no question was raised as to the useful life determinations assigned by the plaintiff, and no further mention of those determinations will be made in this opinion.

4. See "Appendix A" to this opinion. It is now established that where a taxpayer purchases a mixed aggregate of assets for a single, lump-sum purchase price, that price must be fragmented and assigned to the several assets or groups of assets that were the subject of the whole purchase. See F. & D. Rentals, Inc., 44 T.C. 335, 346 (1965).

full knowledge of all of the facts relevant to the transaction.

The government's rebuttal evidence was limited to an attempt to prove that the cost of constructing radio stations in the United States for the years 1961 to 1963 and the purchase cost of radio broadcasting equipment for these same years was very much less than the $307,000 paid for WRAW, Inc. The government's proof was based on an analysis of ninety-nine applications for new radio station licenses, made to the Federal Communications Commission during the years in question.

An attorney for the Federal Communications Commission testified, in effect, that such applications require submission of a specified FCC form (FCC Form 302) containing financial information from which actual construction costs and the cost of radio broadcasting equipment can be ascertained. Although the Court considered such evidence to be of dubious probative value to start with, it did allow the testimony of the FCC attorney and allowed into evidence the ninety-nine application forms in the hope that this evidence might be of some assistance.

On cross-examination, however, it developed that these applications really did not show the cost of constructing new radio stations throughout the United States as the government contended, nor did they present an accurate representation of the cost of radio broadcasting equipment. Cross-examination by taxpayer's counsel and subsequent examination by the Court of the ninety-nine application forms lead to the ruling that information contained in the applications could not form a basis for fairly determining the cost of new radio stations in the United States.

The financial data required by FCC Form 302 includes, in many instances, rental payments for buildings and equipment, amortization costs on mortgages, and only in some cases the actual cost of constructing a radio station *in toto*.[5] In short, the government's purported rebuttal evidence did not rebut.

B. *Allocation of $100,000 to Transmitter Site Lease*. The more difficult task for both taxpayer and Court concerns the taxpayer's allocation of $100,000 of the purchase price as the fair market value of the transmitter site lease, the twelfth asset. Mr. Rust's original allocation, and expert witness Harvey's estimate, were both calculated by what may loosely be termed "the subtraction method."

Rust testified that, after determining what he considered to be the aggregate fair market value of the tangible assets, he subtracted that sum from the purchase price (after due allowance had been made for the real estate) and arrived at the $100,000 figure.[6] Similarly, Harvey testified that he had appraised the entire station at a value of $275,000, subtracted therefrom his estimate of the value of the tangible assets ($175,000) to arrive at an identical $100,000 figure for the leasehold. (Harvey's estimate did not involve any consideration of realty, as he testified that he was unaware that any such realty was offered in the sale.)

The use of the "subtraction method," as applied to the valuation of the transmitter site lease, offers little, if any, positive proof of fair market value. The lease, as valued by the taxpayer, was used as a depreciation deduction "catch-all" for that portion of the purchase price that could not realistically be allocated to any of the eleven groups of "tangible" assets. This "process-of-elimination" valuation fails to convince this Court that its basis is other than the taxpayer's desire for a depreciation deduction.

5. The FCC attorney's testimony indicated to this Court that the fundamental purpose of the Form 302 financial data requirement is to serve as a basis of determining whether or not the applicant is sufficiently capitalized to survive its first year in the broadcasting business.

6. See note 2, *supra*.

In addition to the basic objection inherent in the *method* of valuation, there are two other obstacles that have not been surmounted by the taxpayer. The first is the failure to prove that other transmitter sites were unavailable, or alternatively, available only at a cost in excess of $100,000. The second derives from the terms of the lease itself. At the time of the purchase, there remained a balance of seven years of its original ten year term, with an option to renew for an additional period of five years. The lease, however, also contains the following option:

> Provided, however, that either party shall have the option of terminating this lease at any time during the initial ten year term or during any renewal term upon eighteen months prior notice to the other party.

In short, Radio Station WRAW, Inc., held a lease terminable by either party on eighteen months written notice. No real evidence was introduced by the taxpayer as to the probabilities of the lease remaining in effect for the balance of the term and the renewal term. $100,-000 is a high price to pay for a lease that can be canceled on eighteen months notice. Further, it should be noted that the annual rental provided in the lease was $1,800, payable at the rate of $150 per month. The amount of this lease payment is considered by the Court as at least some indication of the total value of the lease.

Unquestionably, the lease site had some value in 1961, but the Court cannot accept the contention that its value was $100,000. In this respect, the taxpayer has failed to sustain his "double" burden of (a) showing the reallocation of the Commissioner to be incorrect, and (b) showing affirmatively a correct allocation. Absent such proof, this finding of the Commissioner must stand: the value of the transmitter leasehold remains at zero.

C. *Goodwill.* One of the most hotly contested issues in the case was "good-will." Both the taxpayer and the government spent considerable time and effort briefing and arguing the value, if any, of goodwill purchased by the taxpayer from Radio Station WRAW.

Realistically, the Court recognizes that the absence of any allocation of a part of the purchase price to the nondepreciable asset goodwill was a catalytic factor in the Commissioner's determination to redetermine the taxpayer's allocation. This assumption is buttressed by the fact that WRAW, Inc., was the holder of an FCC license enabling it to broadcast, and that license was assigned, with FCC approval, to the taxpayer at the time of the sale.

It is the government's contention that the $100,000 allocated to the transmitter site lease was really a payment for goodwill and/or the transfer of the FCC license—neither of which, of course, are depreciable assets.

The Court recognizes that the Commissioner's approach to the valuation of goodwill is essentially the same as the taxpayer's method of the valuation of the cost of the transmitter site lease; *i. e.,* goodwill is used as a "catch-all" for that portion of the purchase price that he does not feel should be eligible for a depreciation deduction. While the cases construing goodwill are legion, this Court's definition, in the context of this case, is simply *that portion of the purchase price not subject to a depreciation deduction.*

The taxpayer took the position that there was no goodwill involved in the sale because the station had allegedly been losing money during the years prior to the sale. Its proof as to this was based solely on Mr. Rust's statement to that effect. No direct evidence, either by witnesses or documents, was introduced as to the financial condition of Station WRAW, Inc. Since Mr. Rust's statement was patently hearsay, and since he is the one person most interest-

ed in the outcome of the case, the Court finds this evidence to be of little probative value.

The taxpayer also maintained that the transfer of the WRAW "call letters" and the FCC broadcasting license were valueless and relied for support of this position, in the main, on FCC policy and decisions holding that an FCC license is not a property right that can be bought and sold. But the taxpayer, through Mr. Rust, also testified that the price paid was for a "going business" and that the depreciable assets would have had salvage value only but for the fact that they were in place and operating at the time of purchase.

The only finding that this Court can make as to the taxpayer's contention that no part of the purchase price was paid for goodwill is—"not proven."

The Court expresses no opinion as to whether or not goodwill and the FCC license should be valued as separate assets. Since both are nondepreciable assets, it makes no difference, especially since the taxpayer has failed to establish that the fair market value of the transmitter site lease was $100,000.

The taxpayer's tax returns for the years in question will be recomputed in accordance with this decision.

So ordered.

## APPENDIX A

### Schedule of Assets

| Property | Cost Allocation By Plaintiff | Cost Allocation By IRS | Useful Life By Plaintiff |
|---|---|---|---|
| A. M. Transmitter Equipment | $ 12,326 | $ 9,500 | 10 yrs. |
| A. M. Radiating System | 9,650 | 8,000 | 86 mos. |
| Studio Technical Equipment | 26,310 | 10,737 | 10 yrs. |
| Other Technical Equipment | 13,190 | 595 | 10 yrs. |
| Furniture and Fixtures | 12,509 | 3,125 | 10 yrs. |
| Office Equipment | 3,835 | 1,505 | 10 yrs. |
| Transmitter Enclosure | 4,000 | 3,000 | 86 mos. |
| Transmitter Leasehold Improvements | 3,926 | 2,000 | 86 mos. |
| Studio Leasehold Improvements | 102,084 | 65,000 | 117 mos. |
| Records and Transcriptions | 5,000 | 3,000 | 10 yrs. |
| Signs and Billboards | 3,950 | 2,000 | 10 yrs. |
| Transmitter Site Lease | 100,000 | –0– | 86 mos. |
| Totals | $296,780 | $108,462 | |