**E. Cody LAIRD, Jr., and Joanne H. Laird, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 17892.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 26, 1975.

Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Emmet J. Bondurant, A. Stephens Clay, Atlanta, Ga., for plaintiffs.

Tax Div., Dept. of Justice, Jay R. Weill, Atty., Tax Division, Washington, D. C., for defendant.

## STATEMENT OF THE CASE

HOOPER, Senior District Judge.

Plaintiff taxpayers brought suit against the United States to recover income taxes (and interest thereon) assessed against and collected from them with reference to the tax years 1967 and 1968.

Plaintiffs' right to the refund sought in this case depends upon the resolution of several novel and complex issues concerning the validity of income tax deductions claimed by The Five Smiths, Inc.,[1] a Georgia corporation whose primary purpose and principal business was the ownership and operation of the Atlanta Falcons, a professional football team which was a member of the National Football League.[2]

### I. PROCEDURAL POSTURE OF THE ACTION

During the years in question, plaintiff E. Cody Laird, Jr.,[3] was a stockholder of Five Smiths. For its taxable years ending January 31, 1967 and January 31, 1968, Five Smiths elected to be taxed as a "Sub-chapter S Corporation" pursuant to Title 26 U.S.C. §§ 1371–1379, and the corporation's tax consequences were passed through to the stockholders.

Five Smiths reported losses of $506,329.00 in 1967 and $581,047.00 in 1968, and plaintiffs, in turn, reported on their tax returns their proportionate share of the losses of the corporation in the amount of $30,380.00 in 1967 and $34,638.00 in 1968. Subsequently, the Internal Revenue Service audited the tax returns of Five Smiths and disallowed certain deductions which resulted in the determination that the corporation realized taxable income in the amounts of $544,404.00 in 1967 and $641,692.00 in 1968, rather than the losses originally reported. The IRS thereafter also audited plaintiffs' returns for 1967 and 1968, disallowed deductions of their proportionate share of the corporation's claimed losses, and included in gross income plaintiff's share of the corporation's taxable income. Plaintiff paid the assessments, submitted a claim for a refund, and after its disallowance, filed the instant suit seeking judgment against defendant in the amount of $48,218.99, plus interest and costs.

### II. THE DISPUTED DEDUCTIONS

In 1966, Five Smiths purchased from the NFL and its fourteen member teams certain assets thought to be necessary to the establishment and operation of a NFL team in Atlanta, Georgia. The issues presented in this case concern the tax consequences of that purchase.

The total amount of cash consideration paid by Five Smiths in exchange for the assets acquired from the NFL and its member teams under the terms of the formal agreement between the parties dated February 14, 1966 was $8,500,000.02. On its tax returns for each of its taxable years ending January 31, 1967 and January 31, 1968, Five Smiths treated the $8,500,000.02 as follows:

1. $50,000 was reported as the admittedly nondepreciable cost of the NFL franchise;

2. $727,086 was reported as deferred interest and the appropriate deduction was taken; and

3. $7,722,914.02 was reported as the cost of forty-two veteran professional football player contracts

1. Hereinafter referred to as "Five Smiths".

2. Hereinafter referred to as "NFL".

3. Plaintiff Joanne H. Laird was not a stockholder of the Five Smiths but is a party to this action by virtue of having filed joint income tax returns with her husband for the years in question.

and options and, on the basis of an estimated useful life of 5.25 years, depreciation deductions of $1,471,031.24 were taken in each of the taxable years in question.

Pursuant to audit, the IRS agreed that the treatment accorded the $50,000 cost of the franchise and the $727,086 deferred interest was proper, but determined that only $1,050,000 should be allocated to the depreciable asset "player contracts and options" and that $6,722,914.02 (the remainder of the total purchase price less interest in the amount of $727,086) should be allocated to the nondepreciable cost of the NFL franchise. Accordingly, the depreciation deductions claimed by Five Smiths in the amount of $1,471,031.24 in each year were disallowed to the extent of $1,271,031.24.

Disallowance of these depreciation deductions led to the assessments made against the plaintiff and ultimately to this litigation.

### III.  THE ISSUES

The initial issue is whether the sum of $7,722,914.02 claimed by Five Smiths as the basis for depreciation of forty-two veteran professional football player employment contracts reflects with reasonable accuracy the acquisition costs of the contracts when viewed in the context in which they were acquired, or whether that sum was arbitrarily and erroneously assigned for the purpose of achieving favorable tax consequences.

An alternative issue is whether Five Smiths rights to participate equally with the other member clubs in network television contracts was a depreciable intangible asset.

### IV.  POSITIONS OF THE PARTIES

In support of the accuracy of the deductions claimed by Five Smiths, plaintiff contends:

1.  that the February 14, 1966 agreement between Five Smiths and the NFL and its fourteen member teams establishes conclusively that the purchase price paid for the player contracts and options was $7,722,914.02, and that the sum was arrived at through arms length negotiations between buyer and seller and was reasonable under the circumstances existing at the time; and

2.  that no part of the consideration paid to the fourteen member teams can be attributed to the cost of the NFL franchise because (a) the NFL as an entity was separate and distinguishable from the fourteen member clubs, (b) in February, 1966, the franchise was not worth more than the sum of $50,000.00 as specified in the Constitution and By-Laws of the NFL as the cost of a franchise, plus the non-cash consideration agreed to by the Five Smiths, and (c) where separate properties are sold by separate entities to a common purchaser the transactions can not lawfully be lumped together and the costs can not be merged.

In the alternative, plaintiff contends that Five Smiths' right to receive television revenue under the terms of Article VIII(f) of the February 14, 1966 agreement had a fair market value of approximately $4.3 million and a useful life of four years and was also a depreciable intangible asset.

In opposition to the deductions claimed by Five Smiths, the government contends:

1.  that, in order to gain entrance to the NFL, Five Smiths was charged a total fee of $8,500,000 in exchange for which the NFL and its members gave up and Five Smiths acquired a bundle of inextricably related assets including membership in the NFL, forty-two veteran player contracts, a pro rata share of television revenue, the right to be the sole provider of NFL football in the territory within a seventy-five mile radius of Atlanta, the right to secure players through participation in the college draft of rookie players, trades with other teams, and the waiver system, and other related assets;

2. that implicit in the allocation of $8,450,000 to the cost of player contracts and $50,000 to the cost of the franchise is the conclusion that other valuable assets (e. g., television rights) had a fair market value of zero, a conclusion which the government views as erroneous;

3. that, while the agreement between the parties specifies that the purchase price of membership in the league was $50,000.00 and the purchase price of the forty-two player contracts was $8,450,000.00, the terms of the agreement did not represent the economic realities of the transaction but were agreed upon with a view toward achieving certain favorable tax consequences, and that for tax purposes, the substance of a transaction (i. e., the economic realities) must prevail over the form (i. e., the documents).

With regard to plaintiff's alternative argument, the government contends that Five Smiths' right to participate equally with the other member teams in television revenue was not a depreciable intangible asset because it had no limited useful life the duration of which could be determined with reasonable accuracy.

## FINDINGS OF FACT

1. In 1965 and 1966, the NFL was an unincorporated, non-profit, tax-exempt association of professional football clubs. Prior to the admission of the Atlanta Club, the League consisted of fourteen member teams. League affairs were conducted by a Commissioner who acted pursuant to authority conferred upon him by the Constitution and By-Laws of the NFL and by resolutions voted upon and approved by a specified number of the member teams. Funds to meet the operating expenses of the League were acquired through periodic assessment of the member clubs.

2. The member clubs of the NFL were in a unique relationship with each other. While the precise nature of the association is impossible to describe in purely legal terms, it might be characterized as a joint venture, or trade association organized for the purpose of promoting and fostering the primary business of its members. While the member teams were competitors on the playing field, they were seldom competitors in the business sense. The nature of the League was such that the members were bound by rules and regulations designed to promote competitive balance among themselves.

3. In 1965, both the NFL and a rival professional football league, the AFL, were interested in expanding their respective leagues by selling a league franchise for operation by 1966 in Atlanta, Georgia. The two leagues were engaged in keen competition during the mid 1960's, and this so-called "war" between the leagues had resulted in increased costs to the team owners in both leagues for players and other assets.

4. The purchase of an NFL franchise admitted the purchaser into membership in the NFL. In 1966, the creation and sale of a NFL franchise required the affirmative vote of twelve of the fourteen member clubs. In addition, the NFL Constitution specified that, in order to become a member of the League, a professional football team was required to agree to be bound by League rules and regulations, to pay all League assessments, and to pay a fee of $50,000.00. The $50,000.00 was used by the NFL to defray expenses of implementing the expansion.

5. Membership in the NFL carried with it substantial and valuable rights and benefits, including the following:

(a) The exclusive right to exhibit NFL football within seventy-five miles in every direction from the corporate limits of the home of the team; i. e., no other member of the NFL was permitted to play games (except games with the home club) in the home territory of a member and no franchise could be granted for operation within the home territory of a member without the prior written consent of that member.

(b) The right to participate in and obtain players through the college draft,

trades with other teams (for players or future draft choices), and the waiver system.

(c) The benefit of league administrative services including such things as preparation of game schedules, negotiation of television contracts, organization of the college draft, resolution of disputes among member clubs and others.

(d) The benefit of league rules and regulations restricting business competition among the member clubs.

6. The value of the NFL franchise was substantial, although the court can not determine its precise value with any degree of accuracy under the available evidence.[4]

7. The following letter dated June 29, 1965 from Commissioner Rozelle to Rankin Smith confirmed the understanding between the parties relating to the sale of the franchise and related assets.

29 June 1965

Mr. Rankin M. Smith
Life Insurance Company of Georgia
573 West Peachtree Street, N. E.
Atlanta, Georgia 30308

Dear Mr. Smith:

This shall confirm the understanding between the National Football League (hereinafter referred to as "National") and Rankin M. Smith (hereinafter referred to as "Smith") to the effect that National has granted a franchise in said league to Smith to be operated in Atlanta, Georgia, commencing with the 1966 football season subject to the following terms and conditions:

1. Smith agrees to pay the sum of fifty thousand dollars ($50,000) for said franchise; $25,000 of said amount shall be paid on or before July 10, 1965, and the balance upon the obtaining of a satisfactory lease on the Atlanta stadium as herein set out.

2. Smith further agrees to pay to the member clubs of National the sum of $8,450,000 for the purchase of players owned by the member clubs of National to be assigned and transferred to Smith as hereinafter set out. Said sum of $8,-450,000 shall be paid to the Commissioner of National as trustee for the member clubs in the following manner: 25% on but not before August 15, 1966, and the balance in four equal annual installments on the 15th day of each August thereafter until fully paid.

3. Each member club shall sell Atlanta following the close of the 1965 season three veteran members of its active list then under contract. The identity of such players and the method of selection shall be pursuant to a formula hereafter adopted by the member clubs at the 1966 annual meeting of National. Under such formula each club may withhold a fixed number of players free from selection and shall make the balance of its active list available for selection to Smith. Smith shall not be entitled to select more than three players per club.

4. This agreement by Smith is contingent upon Smith being able to obtain a satisfactory lease for the use of the Atlanta stadium permitting Smith to operate a National Football League franchise in Atlanta and to use said stadium upon terms satisfactory to Smith for a minimum period of ten years commencing in 1966; such lease to be awarded on or before the 6th day of July 1965.

5. When the lease shall have been acquired and Smith admitted as a member of National, Smith shall receive the following:

A. A franchise for Atlanta in National.

B. Smith shall be entitled to participate in the 1965 selection meeting of National and shall be awarded the first choice in the first twenty rounds thereof and an extra choice at the end of each of the first five rounds.

C. Smith shall receive one-fifteenth of any sum paid by any network

---

4. *See* Conclusion of Law No. 10.

for any single network television contract commencing in 1966 and a pro rata share each year thereafter while Atlanta holds a franchise.

6. The selection of management and coaches shall be subject to the prior approval of the Commissioner of National. Similarly, any other persons other than Smith who shall own a share in said club shall be subject to approval by the member clubs of National. In no event shall Smith personally own less than fifty-one percent of said franchise.

7. In addition thereto Smith shall personally guarantee all financial obligations hereinabove set out.

8. If a sixteenth franchise is granted, Smith shall not participate in any share of any monies paid for such new franchise granted by National.

9. The entity to operate the franchise and the persons owning any interest therein shall be subject to and bound by the Constitution and By-Laws of the National Football League.

This letter shall constitute a memorandum agreement and be binding upon National and Smith. Upon its execution and upon the procurement of a lease on the stadium hereinabove referred to, a more formal document shall be prepared and executed setting forth in detail the terms thereof.

If this letter meets with your approval, kindly affix your signature on a duplicate copy thereof at the place indicated and the same shall constitute a binding agreement between us.

Very truly yours,

THE NATIONAL FOOTBALL LEAGUE

BY: Pete Rozelle
Pete Rozelle, Commissioner

I have read the foregoing, consent thereto, and agree to be bound thereby.

RANKIN M. SMITH
Rankin M. Smith

8. On August 6, 1965, Rankin M. Smith, R. Howard Dobbs and M. E. Kilpatrick successfully petitioned the Fulton County Superior Court for the incorporation of a business under the name "The Five Smiths, Inc." Subsequently, Rankin M. Smith acquired 64% of the outstanding stock of the corporation and plaintiff E. Cody Laird, Jr. acquired 6% of the stock. On September 3, 1965, at the first meeting of the Board of Directors of Five Smiths, Rankin Smith reported that ". . . the 42 players to be acquired from the other fourteen clubs in the league will be the least talented players of each team, since the selling clubs will naturally reserve the most talented players . . . ."[5]

9. Five Smiths participated in the college draft of rookie players conducted in November of 1965, and was allowed first choice of players in each of the first twenty rounds and an extra choice at the end of the first five rounds. The twenty-four college draftees who signed NFL contracts (one draftee went to an AFL team) were paid a total of $1,053,-454.00 in bonuses, and of that total, one player received approximately $442,684.-00. The average bonus paid to the twenty-four college draftees was approximately $43,894.00 and, if the one player who received $442,684.00 is excluded from the computation, the average bonus paid to the remaining twenty-three college draftees was approximately $26,-800.00 per player.

10. On February 14, 1966 at a league meeting in Palm Beach, Florida, Five Smiths and the member teams reached agreement on a formula for the selection of players in the "expansion draft" and the member teams voted unanimously to authorize the Commissioner to execute a formal agreement with Five Smiths pursuant to which the expansion would be consummated.

11. Subsequent to the execution of the February 14, 1966 agreement and

5. Exhibit D–13; Transcript Vol. V, P. 185.

pursuant to its terms, the so-called expansion draft was conducted as follows:

(a) The players made available for selection were those who were on the Active List of a member club at the close of the 1965 season or on the Reserve List of a member club as a result of injuries sustained during the 1965 season, and all players were required to be under contract to the selling team for at least the 1966 season.

(b) From its list of forty players, each member team was allowed to protect or "freeze" twenty-nine players, leaving a pool of eleven players.

(c) Five Smiths was allowed to select one player from the pool of eleven.

(d) Each member team was then allowed to protect two additional players, leaving a pool of eight.

(e) Five Smiths was allowed to select two final players from the remaining pool of eight.

(f) Through this procedure, Five Smiths drafted three players from each of the fourteen member teams, a total of forty-two players.

12. The following facts concerning the expansion draft appear in the record:

(a) Five Smiths entered the expansion draft with approximately fifty other football players under contract. These players consisted of free agents and rookies acquired in the college draft.

(b) The forty-two players acquired in the expansion draft had a total of 149 years of prior experience in the NFL.

(c) Twenty-five of the 42 players acquired in the expansion draft were on the Falcons active roster at the beginning of the 1966 season. Of these 25, 18 were starters throughout the season and the other 7 started occasionally. Two of the 25 were injured during the year and placed on the injured reserve list. Another was released by waivers on September 21, 1966 after the season had begun and went on to play the season with another professional football team. There were 22 expansion draftees on this active roster at the end of the 1966 season.

(d) With respect to the 17 players chosen in the expansion draft but not on the Falcons' 1966 active roster at the beginning of the season, two were traded, one for another player who made the 1966 active roster. One player was placed on the injured reserve list. Four players were waived and claimed by other teams, and all four played for those teams in 1966. Three of the remaining ten were placed on Atlanta's reserve list; seven were released entirely and did not play football.

(e) Nineteen of the 42 players chosen in the expansion draft remained on the Falcons' active roster at the beginning of the 1967 season. Seventeen of the 19 were regulars throughout the season. Two of the 19 were traded during the season for other players and a draft choice.

(f) Eight of the 42 expansion draft players, remained on the Falcons' active roster throughout the 1968 season. A ninth was placed on injured reserve. Four other expansion veterans who had played the preceeding two years were traded prior to the 1968 season in exchange for one player who became a regular in 1968, one who made the active roster in 1969, and 2 draft choices. Additionally, two of the veteran players who had played for Atlanta in 1966 and 1967 spent the 1968 season playing professional football in the American Football Conference.

(g) Thirteen of the 42 veterans ultimately were traded. In exchange for the 13, the Falcons received 14 draft choices and also five players who became Falcon starters.

(h) After the 1968 season, none of the 42 expansion draft veterans reappeared on the Falcons' roster, although several players acquired in exchange for those veterans by trades or draft choices continued as members of the team.

13. The useful life of five and one-quarter years assigned to player contracts by Five Smiths was reasonably accurate under the circumstances and was a proper measure for the purpose of computing depreciation deductions.

14. With regard to television rights, the letter of intent dated June 29, 1965 specified the following: [6]

"Smith shall receive one-fifteenth of any sum paid by any network for any single network television contract commencing in 1966 and a pro rata share each year thereafter while Atlanta holds a franchise."

Article VIII, Paragraph (f) of the February 14, 1966 agreement specified the following: [7]

"Smith shall be entitled to participate equally with all other member clubs in any Single Network television contract(s) hereafter executed by the League for the year 1966 and thereafter during the time the Atlanta Club continues as a member of the League."

15. While television rights were owned by the member teams individually rather than by the League, Congress had passed legislation in the early 1960's exempting the NFL and other professional sports leagues from the anti-trust laws in order to allow them to bargain collectively for the sale of television rights. This pooling of television rights was of great benefit to league members and was considered a major factor in the growth of the NFL. Yearly television revenue had increased from approximately $150,000.00 per team in the early 1960's to over $1,000,000.00 per team in 1965.

16. Television income was crucial to Five Smiths. Prior to the execution of the June 29, 1965 letter of intent Mr. Smith's counsel had been advised that a contract was being negotiated whereby Five Smiths might reasonably expect to receive approximately $1,000,000.00 per year from television. Mr. Smith's

counsel testified that Mr. Smith would not have gone through with the purchase if he had not been assured of this television income.

17. In December, 1965 Commissioner Rozelle agreed to a television contract with the CBS Television Network under the terms of which CBS was granted the right to televise NFL games during the years 1966 through 1969. CBS agreed to pay the member teams of the NFL the amounts shown in the following schedule during the four-year term of the contract:

| Year | Amount |
|------|--------|
| 1966 | $18,800,000.00 |
| 1967 | $20,050,000.00 |
| 1968 | $20,300,000.00 |
| 1969 | $20,050,000.00 |

The minimum amount of income Five Smiths could reasonably have expected to receive from the four-year CBS contract is shown in the following schedule:

| Year | | Amount |
|------|--|--------|
| 1966 | | $1,248,000.00 |
| 1967 | | $1,220,000.00 |
| 1968 | | $1,142,500.00 |
| 1969 | | $1,126,875.00 |
| | Total | $4,737,375.00 |

Using a prime rate of interest of five per cent, the present value on February 14, 1966, of the payments Five Smiths could reasonably have expected to receive under the terms of the four-year CBS television contract is shown in the following schedule.

| Year | | Amount |
|------|--|--------|
| 1966 | | $1,207,579.00 |
| 1967 | | $1,124,847.00 |
| 1968 | | $1,002,716.00 |
| 1969 | | $ 914,901.00 |
| | Total | $4,277,043.00 |

18. When the minimum present value of Five Smiths' television rights ($4,277,043.00) is subtracted from the total amount in dispute in this case ($7,722,914.02), the sum of $3,445,871.-02 remains for allocation among the re-

6. Stipulation Exhibit A.

7. Stipulation Exhibit B.

maining assets acquired in the expansion agreement (*e. g.*, player contracts and the franchise). The computation is illustrated in the following chart:

| | | |
|---|---|---|
| TOTAL CONSIDERATION PAID BY FIVE SMITHS | | $8,500,000.02 |
| MINUS: Items not in dispute | | |
| (a) Membership Fee | $ 50,000.00 | |
| (b) Interest | + $ 727,086.00 | |
| | $ 777,086.00 | − $ 777,086.00 |
| EQUALS: Total Amount in Dispute | | $7,722,914.02 |
| MINUS: Minimum Present Value of Television Rights | $4,277,043.00 | − $4,277,043.00 |
| EQUALS: Remainder of Purchase Price Available for Allocation to Remaining Assets Acquired | | $3,445,871.02 |

19. With regard to the useful life of Five Smiths' right to share in television contracts, both the letter of intent dated June 29, 1965 and the formal agreement dated February 14, 1966 are clear. The former stated that the rights existed "while Atlanta holds a franchise." The latter stated that the rights existed "during the time the Atlanta Club continues as a member of the League."

Since it was impossible to determine how long Atlanta would continue as a member of the league, it was impossible to determine the useful life of Five Smiths' rights to share in the league television pool. In order to find (as plaintiff contends) that Five Smiths' rights to participate in the league television pool came to an end upon the expiration of the four-year CBS contract, the court would be required to disregard the plain language of the February 14, 1966 agreement, a course which it declines to follow.

20. Texas E. Schramm, well-known and successful General Manager of the Dallas Cowboys since 1960 and one of plaintiff's expert witnesses on the question of fair market value of player contracts, testified that in his opinion the forty-two player contracts acquired by Five Smiths had a fair market value in 1966 of $7,300,000.00. Mr. Schramm arrived at his valuation by constructing a rating system based on the assumption that any veteran professional football player had a fair market value of at least $50,000.00 and that any starting player had a fair market value of $250,-000.00 in 1966. Between the two extremes just described, he created a scale of valuation consisting of the following five categories: [8]

(a) Players who had at least made a professional football team were valued at $50,000.00.

8. Mr. Schramm described his methodology as follows:

"And so in making a judgment on these players that were sold to the Atlanta Falcons, I started on the premise that any player who was able to make a professional football team had, at least, the value of $50,000.00, because I was, and am convinced that in those times you would have been very, very pleased to have obtained a football player who you knew could make your squad for $50,000.00.

"On the other side of the ledger, I felt that any player that was a starter, that you felt confident or had past experience or a reason to believe this player was a starter, top person on the market at that time, and would have been worth $250,000.00. I felt that was a conservative figure.

"So I took all of these players and rated them from one to five, with one exception, the one being a player who had at least made a professional football team, and the

(b) Fringe players who were good prospects were valued at $100,000.00.

(c) Players who had good potential but who would probably never be starters were valued at $150,000.00.

(d) Players who had played a good deal but who had not been starters were valued at $200,000.00.

(e) Starting players were valued at $250,000.00.

Mr. Schramm rated each of the forty-two players actually acquired by Five Smiths and assigned each player to one of the five categories described above, totaled the assigned values, and arrived at a total fair market value of $7,300,000.00.

Mr. Schramm corroborated his valuations by referring to the amounts other teams were paying in 1966 in order to acquire certain rookies in the first three rounds of the college draft.

21. This Court was compelled to reject the valuation of 7.3 million dollars made by witness Schramm and of 6.8 million dollars made by witness Finks for the following reasons:

1) Their total figures greatly exceeded the total amount available for allocation to players' contracts, and also for value of the franchise and rights incident thereto. The amount available as shown in Finding of Fact No. 18 was $3,445,871.02.

2) While both of said experts are men of unquestioned integrity and they must have been sincere in making their estimates of valuation, this Court cannot accept valuations based on the method described by witness Schramm in Finding of Fact No. 18, in so far as it was based on a comparison of a veteran player whose record of performance in the NFL was known, with a rookie player obtained in the college draft; in many instances large sums were paid for the college draftees who, when meeting the severe tests of professional football, could not measure up to the standards required. Opinions however, by Messrs. Schramm and Finks together with the Falcons' first coach, Norbert Hecker, hereinafter discussed were based primarily on personal knowledge of the veteran players acquired in connection with their official duties with teams which were members of the NFL.

22. The court advised counsel for both parties that, while plaintiff was entitled to a deduction for player contracts, the court could not accept plaintiff's contention that the total amount in dispute, $7,722,914.02, should be allocated to player contracts in light of the value of other assets acquired in the same transaction. Plaintiff's counsel then requested a final argument which the court allowed and which took place on February 6, 1975.

On February 5, 1975, plaintiff's counsel filed a full and comprehensive brief focusing the attention of the court primarily upon the testimony of Norbert Hecker, the first coach of the Atlanta Falcons, and arguing that the minimum valuation of the forty-two player contracts which the record would support would be $3,035,000.00. A full summary here of the information concerning each of the forty-two players would unnecessarily prolong this opinion; however,

---

five being a player that was a regular, would be most certainly counted upon to be a regular, he was assigned the rating of five. I assigned $50,000.00 increments to each rating point.

\*      \*      \*      \*      \*

"As an example let's take a player that I rated as a number four player. This is a player who might not necessarily be a regular, was a player that participated a great deal, made a contribution, may not have been a regular because the man in front of him had superior ability, but he was a very good football player.

"And conversely, at the other end of the line, a player that was rated as a two or, we'll say in some cases a three, this was a player that would be a fringe player in the case of a two, possibly, or a journeymen player, or that hadn't really done too much but was a prospect—was a good prospect. So he would fall generally in this area of two to three." Trans., Vol. II, Pp. 7–9.

the court will illustrate the general nature of the facts in the record bearing on the fair market value of individual player contracts as follows:

(1) V–1 was a twenty-three-year-old player formerly with the New York Giants who had played off and on as a regular, and had played both offense and defense. Witnesses Schramm and Finks testified that teams in the NFL would have been willing to pay $150,000.00 for the rights to V–1. Under the alternative valuation approach suggested by plaintiff's counsel in their Supplemental Post-Trial Brief, it is argued that, based on the testimony of Coach Hecker concerning the relative prospective skills of linemen acquired in the expansion draft, contract rights to V–1 would have had a minimum fair market value of $35,000.00, a figure considerably below the value attested by witnesses Schramm and Finks.

(2) V–2 had had three years experience with the Cleveland Browns where he was a starting defensive back. Mr. Schramm testified that V–2 had proven his ability to perform as a starter in the NFL and that, in his opinion, teams in the NFL would have been willing to pay $250,000.00 for the rights to V–2. Mr. Finks testified that V–2's contracts had a fair market value in February, 1966 of at least $200,000.00.

Under the alternative valuation approach suggested in plaintiff's Supplemental Post-Trial Brief, it is contended that the rights to V–2 had a fair market value of at least $140,000.00.

The testimony in the record as to the remaining forty veteran players follows in a general way the testimony concerning V–1 and V–2 summarized above. For a more complete discussion of each of the veteran players, see Plaintiff's Post-Trial Brief (Appendix) filed December 31, 1974, and Plaintiff's Supplemental Post-Trial Brief filed February 5, 1975.

23. After reviewing all the evidence in the record, the court is persuaded that the testimony of Norbert Hecker analyzing the veteran players and comparing them among themselves and to various college rookies, the evidence demonstrating the cash value of college rookies comparable in ability to the veteran chosen by Five Smiths, and the valuations of plaintiff's expert witnesses discounted to a degree, all prove with reasonable certainty that on February 14, 1966 under the circumstances then prevailing in professional football, the contract rights to the forty-two veteran players purchased by Five Smiths had a total fair market value of $3,035,000.00. That amount lies within the range of values allowable as depreciable intangible assets, is supported by persuasive evidence, and is reasonable.

## CONCLUSIONS OF LAW

1. The Internal Revenue Code allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or held for the production of income. Int.Rev.Code of 1954, § 167(a). The purpose for which the deduction is allowed is "to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 101, 63 S.Ct. 902, 904, 87 L.Ed. 1286 (1942).

2. Depreciation deductions are not limited to tangible assets but can also include intangible assets. Griswold v. Commissioner of Internal Revenue, 400 F.2d 427 (5th Cir. 1968). Depreciation of intangible capital assets is specifically provided for in Treas.Reg. § 1.167(a)–3 (1956):

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allow-

ance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

■ 3. In a proper case, a professional football player employment contract may be the subject of a depreciation deduction. Rev.Rul. 71–137, 1971–1 Cum.Bull. 227. The IRS has ruled that the acquisition cost of such a contract must be depreciated over the useful life of the player. *Id.* While it is true that Rev.Rul. 71–137 was not in existence at the time of the acquisition in this case, Rev.Rul. 54–441, 1954–1 Cum.Bull. 101, a similar ruling dealing with the depreciation of baseball player contracts, did exist and that ruling supported the conclusion that such contracts were depreciable assets.

■ 4. It is axiomatic however that before depreciation can be computed, the proper basis for depreciation must be established. *Cf.* St. Louis County Water Co. v. United States, 452 F.2d 1022, 1029, 196 Ct.Cl. 592 (1971); 4 Mertens, Law of Federal Income Taxation, § 23.19. The usual measure of a taxpayer's base for depreciation is the amount of his capital investment in the property less certain adjustments for salvage or resale value. Int.Rev.Code of 1954, §§ 167(f), 167(g), 1011 and 1012. In accordance with the general rule, the IRS has ruled that the proper base for computing depreciation of a professional football player contract is the acquisition cost of the contract; *i. e.*, amounts paid or incurred upon the purchase of a player contract, and bonuses paid to players for signing player contracts. Rev.Rul. 71–137, 1971–1 Cum. Bull. 227.

■ 5. The rule that in a proper case the court can look beyond the formal dealings of the parties to determine where the forms reflect meaningful substance is elementary in the law of taxation. Schulz v. Commissioner of Internal Revenue, 294 F.2d 52 (9th Cir. 1961). As the Supreme Court stated in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945):

"The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

Furthermore, as the Supreme Court stated in Higgins v. Smith, 308 U.S. 473, 477–478, 60 S.Ct. 355, 358, 84 L.Ed. 406 (1940):

"The Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation."

■ The court must look beyond the forms chosen by the parties and determine the tax consequences of the transaction based on the economic realities of the challenged tax event.

■ The court rejects plaintiff's contention that, for the purposes of the sale of a franchise, player contracts, television rights and other related assets to the purchaser of a NFL expansion

team, the NFL on the one hand and its fourteen member teams on the other must be considered to have been separate entities selling separate assets to a common purchaser. But even if the NFL and its member teams could be considered to have been separate entities selling separate assets to a common purchaser and the sum of $7,722,914.02 could be considered to have been the purchase price on only those assets acquired directly from the member teams as opposed to the NFL, the allocation of the entire amount of the purchase price to player contracts and nothing to the extraordinarily valuable television rights which also were owned by and acquired from the member teams in the same transaction would still be erroneous and the court would be justified in disregarding it on the grounds that the allocation failed to comport with economic reality.

■■■■ Furthermore, Five Smiths' right to participate in the league television pool was a nondepreciable asset [9] and, where a taxpayer acquires "a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time." Treas.Regs. § 1.167(a)–5 (1956). The court has found that the television rights had a minimum present value of $4,277,043.00 on February 14, 1966. Under the terms of Treas.Regs. § 1.167(a)–5, that sum, which is definite but not depreciable, would operate to reduce the portion of the total consideration which could reasonably be allocated to player contracts.

■■■ 6. In order to qualify for a depreciation deduction, an intangible asset must have a limited useful life the duration of which can be ascertained with reasonable accuracy. Houston Chronicle Pub. Co. v. United States, 481 F.2d 1240 (5th Cir. 1973); Pohlen v. Commissioner

of Internal Revenue, 165 F.2d 258 (5th Cir. 1948); Treas.Reg. § 1.167(a)–3.

Because Five Smiths' right to participate equally with the other member clubs in television contracts during the time Five Smiths maintained its membership in the NFL had no definite limited useful life the duration of which could be ascertained with reasonable accuracy, the court concludes that the asset was not the proper subject of depreciation deductions.

■■■ 7. It is clear that the court is not bound by the opinion testimony of an expert witness. In Logan Lumber Co. v. Commissioner of Internal Revenue, 365 F.2d 846, 852–853 (5th Cir. 1966), a case in which plaintiff taxpayer's expert witnesses were uncontroverted, the court stated:

"We think the rule is clear, the Tax Court is not bound by the conclusory statements of any witness, even an 'expert.' The Court must look at the substance of a witness' testimony as well as his conclusions. The testimony must be weighed along with all other relevant evidence."

See South Texas Rice Warehouse v. Commissioner of Internal Revenue, 366 F.2d 890, 898 (5th Cir. 1966), cert. denied, 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 454 (1967); Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 192 F.2d 633, 635 (5th Cir. 1951). It is the duty of the trial court to weigh the evidence and draw inferences therefrom.

Therefore, even though the testimony of plaintiff's expert witnesses was largely uncontroverted, the court must weigh that testimony along with all the other evidence in the record and is not required to accept as binding the conclusions of any expert.

■■■ 8. The taxpayer bears the burden of proving his right to claim a depreciation deduction and the amount of the deduction to which he is entitled. Houston Chronicle Pub. Co. v. United States, 481 F.2d 1240 (5th Cir. 1973);

9. *See* Conclusion of Law No. 6, *infra.*

David v. Phinney, 350 F.2d 371 (5th Cir. 1965), cert. denied, 382 U.S. 983, 86 S.Ct. 560, 15 L.Ed.2d 473 (1966); Reading Radio, Inc. v. United States, 299 F.Supp. 616, 617 (D.N.H.1969).

For the reasons stated in the foregoing Findings of Fact and Conclusions of Law, the court holds that the plaintiff has failed to carry his burden of proving by a preponderance of the credible evidence that the total sum of $7,-722,914.02 claimed by Five Smiths as the basis for depreciation of forty-two veteran professional football player employment contracts reflected with reasonable accuracy the acquisition costs of the contracts when viewed in accordance with the principles of economic reality.

While, on the one hand, plaintiff has failed to establish his right to the claimed deductions in the total amount sought, on the other hand, the court does not accept the Government's contention that it is impossible to establish, except in an arbitrary manner, a reasonably accurate basis for depreciation of the veteran player contracts acquired by Five Smiths in February 1966. The Government has conceded that the veteran player contracts were valuable assets. While it is true that in this case the task of proving the fair market value of the contracts was fraught with difficulties, the court can not hold that it was impossible, either as a legal or factual matter, to allocate with reasonable accuracy some portion of the total consideration paid by Five Smiths to the purchase price of the forty-two veteran player contracts.[10]

As the Court of Appeals for the Fifth Circuit observed in Anderson v. Commissioner of Internal Revenue, 250 F.2d 242, 249 (5th Cir. 1957), cert. denied,

356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958);

"Valuation . . . is necessarily an approximation . . . It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence."

And as the Court of Appeals for the Third Circuit stated in Commissioner of Internal Revenue v. Thompson, 222 F.2d 893, 895 (3rd Cir. 1955):

"Although . . . the problem of valuation is difficult, it is not insuperable. It is the function of the trier of fact to weigh all the elements properly considered in the valuation and to translate them into dollars and cents. If there is speculation in this, it is a product of the nature of the problem, but not a reason for abdication of the judicial function, which, in the administration of justice, is frequently called upon to appraise intangibles."

Valuation is, under the best of circumstances, a difficult task because the fair market value of any asset may depend upon, or at least be influenced by, a large number of factors or variables which may be difficult both to identify and to evaluate. But when the asset to be valued is the employment contracts of a group of forty-two professional football players, the task of arriving at a reasonably accurate result is unusually arduous. The court must evaluate (as best it can) all the evidence in the record and arrive at the most reasonable result possible under the circumstances, fully realizing that such a result may necessarily be imprecise.

10. As stated in the case of Arc Realty Co. v. Commissioner of Internal Revenue, 295 F.2d 98, 103 (8 Cir. 1961):
"To give a detailed resume and analysis of the facts for the purpose of demonstrating that the instant determination is invulnerable to a successful attack would unduly and unnecessarily prolong this opinion". It is further stated that fixing the fair value of corporate stock "obviously cannot be accomplished with exactness or complete accuracy." Id.

■ On the basis of the foregoing Findings of Fact and Conclusions of Law, the court is persuaded that there is sufficient evidence in the record to support the conclusion that the forty-two veteran player contracts acquired by Five Smiths may be valued with reasonable accuracy at $3,035,000.00 for the purposes of computing the depreciation deductions which are the subject of this litigation.

■ 9. Plaintiffs shall be entitled to claim depreciation deductions for forty-two veteran player contracts based upon a value of $3,035,000.00 and a useful life of 5.25 years.

10. The following chart summarizes the Findings and Conclusions of this court with regard to the allocation of the total amount of consideration paid by Five Smiths in the February 14, 1966 expansion agreement.

| | | | |
|---|---|---|---|
| TOTAL CONSIDERATION PAID BY FIVE SMITHS | | | $8,500,000.02 |
| MINUS: | Items not in dispute | | |
| | (a) Membership Fee | $ 50,000.00 | |
| | (b) Interest | + $ 727,086.00 | |
| | | $ 777,086.00 | − $ 777,086.00 |
| EQUALS: | Total Amount in Dispute | | $7,722,914.02 |
| MINUS: | Minimum Present Value of Television Rights | $4,277,043.00 | − $4,277,043.00 |
| EQUALS: | Remainder of Purchase Price Available for Allocation to Remaining Assets Acquired | | $3,445,871.02 |
| MINUS: | Amount Allocated to Player Contracts | $3,035,000.00 | − $3,035,000.00 |
| EQUALS: | Remainder to Be Allocated to the Franchise | | $ 410,871.02 |